# Richmond

THIRD BUCKINGHAM COMMUNITY, INC., ET ALS. V. IVAN N.
ANDERSON.

November 24, 1941.

Record No. 2416.

Present, All the Justices.

The opinion states the case.

*Claude O. Thomas* and *Frank L. Ball,* for the plaintiffs in error.

*Anna F. Hedrick,* for the defendant in error.

Browning, J., delivered the opinion of the court.

In October, 1939, the defendant in error, Ivan W. Anderson, instituted an action at law by notice of motion for judgment against the plaintiff in error and two allied corporations, claiming damages for injuries to a large garden and plant bed operation, occasioned by the collection of surface water in an artificial channel and depositing it in a concentrated form with great force and violence upon his said garden and plant beds. The parties will be referred to generally hereafter as plaintiff and defendant, their relation in the trial court.

The jury rendered a verdict for the plaintiff for $1,000.00. The court, by placing the plaintiff upon terms, reduced the amount of the damages to the sum of $873.00, which is the aggregate of the values which the plaintiff put upon the property injured and destroyed, which the plaintiff accepted under protest. The evidence is not much in conflict, but to the extent that it is so, under familiar rules, we are obliged to accept that version that is most favorable to the plaintiff.

The plaintiff has owned a tract of two and one-half acres of land for approximately eight years, and as owner and lessee has had to do with it for about fifteen years. The major part of his business was raising plants of hardy horticultural varieties for sale. His business appears to have been successful and profitable until the happenings which are the subject of this suit.

The defendant owns a tract of twenty-six acres of land which it acquired in 1938, which lies above that of the plaintiff. It at once began the utilization of its lands by erecting large apartment houses and locating and relocating and constructing roadways and streets and installing a system of artificial drainage.

For drainage purposes of his own the plaintiff had dug a ditch through his property and placed a twelve inch pipe under his roadway. This means was quite sufficient to meet his needs. During his occupancy through

all of the years until 1938, he suffered nothing untoward or disastrous from flood waters. It was only after the developments of the defendant that his ills of that nature came. In all the time referred to the surface waters from rains and snows went off gradually over a wide surface and that portion of its volume which was not consumed by sinking or evaporation found its way to the swale or depression natural to the topography of the land and was taken care of by the ditch and pipe installed by the plaintiff.

The defendant soon became troubled by the collection of water in its cellars and it appears to have made a strenuous effort to correct this evil and in doing so it brought about the damage complained of by the plaintiff. The extent of this is realized when his testimony is noted and its effect fully appreciated. The defendant put in and through its lands to within a few inches of the land of the plaintiff a pipe two feet in diameter. It so arranged its drainage system as to collect the surface water from rains falling directly on the ground and that falling on the roofs of the large and extensive apartment houses and put them in concentrated form into this pipe, which gained momentum and force as it was added to by the water which issued from catch basins and other smaller pipes. Its force was so great at the end of the pipe in the fall of 1939, that the area of which the plaintiff's land was a part was flooded as it had never been before. It overflowed his driveway so that at one point it was impassable. The debris was in some places four inches deep which covered most of his plant beds. It washed away his pots and plants and a cold frame 75 feet long and 6 feet wide, made of cinder blocks heavily constructed. Some of this debris was washed 15 feet away. The plaintiff testified that the defendant added so much more drainage area to that which nature had created that even this large pipe was inadequate, and that the water tore up a cement walk. He further testified that in the September, 1939, storm the debris was

so great that the ditch which he had dug on the side of his driveway was completely filled up. The plaintiff submitted a list of the items of damage and we do not understand that its correctness is seriously questioned.

An examination of the maps in evidence shows that the southern boundary of land of the plaintiff and a portion of that of the defendant borders on Lee Boulevard; that the northern boundary of the defendant's land is adjacent to North Henderson Road and through the middle of its lands is North Pershing Drive. These three ways are practically parallel. The last two when prolonged extend to what is known as Glebe Road. There was an old street running at right angles with Lee Boulevard, then Thomas Street, which is now known as Trenton Street. Down this street flowed the water, when there was rain, which did not touch the plaintiff's land. The defendant changed the flow of this water by the construction of a new way called Second Road. Its course was changed to flow east and eventually into the large pipe. Third Street North is another new road over which the water is made to flow until it reaches what is called a turnaround which, as its name indicates, turns the water eastwardly, being augmented by that collected in catch basins, which finally gets into the large pipe.

Again, it was testified that some distance east of North Trenton Street there is a natural crest and a contour map put in evidence by the defendant shows that some of the water flowed west of this crest and some east, that going west not reaching the plaintiff's property, but changes made by the defendant caused all of this water to pass through this pipe and onto the plaintiff's lands. This statement is borne out by the testimony of the plaintiff who is corroborated, in the main, by the testimony of Mr. Pomeroy. He is a landowner whose lands adjoin those of the plaintiff on the north and on the west. He testified that there was no overflow on his or the plaintiff's land at the time of the very severe

storms of 1933, but that after the defendant acquired its property and began its developments, including its system of drainage, the storms in 1939, particularly the heavy rains about the last of August or the first of September, the waters of which were collected and deposited in concentrated form, caused the damage to which the plaintiff testified. He graphically described the nature of the debris as "rock and clods of dirt, potted plants and pots from Mr. Anderson's property, large rocks, fairly large rocks, six or eight inches in diameter, and they were strewn practically the full width of the property". This debris was left on Mr. Pomeroy's property.

Certainly this was credible testimony which undoubtedly amply supports the verdict of the jury. It is difficult for a lay person to comprehend and accurately state the effect of the testimony concerning the maps and their indicia. However, certain large facts stand out in bold relief. One is that the plaintiff suffered no damage caused by water until the defendant arrived and put in motion its concomitants.

■ Another of these facts is that the defendant collected the surface waters in and discharged them from a large pipe, which form it had not hitherto assumed. Another highly potent fact is that the jury viewed the entire premises; they saw the lay of the lands, the streets, the ways, the drainage system and the incident conditions which were the subjects of the testimony, before arriving at their verdict. It is not within the province of the court, under the conditions here existing, to override the judgment of the trial court based upon the jury's verdict.

This view is well supported by the weight of authority, including that of this court.

The plaintiff's brief aptly points out that the defendant's brief is based on the erroneous assumption that in Virginia the modified civil law rule in regard to surface water obtains. It says that this is not so; that in Virginia what is known as the modified common law

rule prevails, and the case of *McGehee* v. *Tidewater Ry. Co.*, 108 Va. 508, 62 S. E. 356, is cited in support of that very sound observation. In that case we find the following:

"Two general rules prevail in the United States with respect to surface water—the civil law rule and the common law rule. The former is thus expressed by the Code Napoleon Section 640:

" 'Inferior lands are subjected, as regards those which lie higher, to receive the waters which flow naturally thereupon to which the hand of man has not contributed. The proprietor of the lower ground cannot raise a bank which shall prevent such flowing. The superior proprietor of the higher lands cannot do anything to increase the servitude of the lower."

■ "On the other hand, by what is known as the 'common law rule' (though it is said the subject has never received the consideration of the English courts, but that the doctrine originated in Massachusetts in 1857, in the case of *Parks* v. *Newburyport*, 10 Gray (Mass.) 28. See 30 Am. and Eng. Ency. L. 331, note), 'surface water is regarded as a common enemy and every landed proprietor has the right, as a general proposition, to take any measures necessary to the protection of his property from its ravages, even if in doing so he prevents its entrance upon his land and throws it back on a coterminous proprietor.' 30 Am. and Eng. Ency. L. 330 note, where the authorities are assembled."

■ "While it is true that the so-called common law doctrine prevails in Virginia, it is nevertheless subject to the important qualification that the privilege conferred by it may not be exercised wantonly, unnecessarily or carelessly, but is modified by that golden maxim of the law that one must so use his own property as not to injure the rights of another. It must be a reasonable use of the land for its improvement or better enjoyment and the right must be exercised in good faith, and with no purpose to abridge or interfere with the

rights of others, and with such care with respect to the property that may be affected by the use or improvement as not to inflict any injury beyond what is necessary.''

See also, *Raleigh Court Corp.* v. *Faucett,* 140 Va. 126, 124 S. E. 433.

In the case of *Norfolk & W. R. Co.* v. *Carter,* 91 Va. 587, 22 S. E. 517, is found the following statement:

''Where the common law rule is in force, as in this state, surface water is considered a common enemy and the courts agree that each landlord may fight it off as best he may.

''This right may not be exercised wantonly, unnecessarily or carelessly but is modified by that golden maxim of the law that one must so use his own property as not to injure the right of another.

''The right, thus modified, has also its exceptions. One exception is that the owner of land cannot collect the water into an artificial channel or volume and pour it upon the land of another, to his injury.''

We find this statement in 27 R. C. L. Section 79, page 1152:

''It is the generally recognized rule both of the civil and common law that a landowner cannot collect surface water into an artificial channel or volume, or precipitate it in greatly increased or unnatural quantities upon his neighbor to the substantial injury of the latter. This is true although no more water is collected than would have naturally flowed upon the property in a different condition for it is evident that, while a given piece of land may receive a large amount of surface water without injury thereto when it flows gently thereon from natural causes, yet when collected and discharged in considerable volume at a given point, it may become very destructive and injurious.''

A leading case on this subject is *Johnson* v. *White,* 26 R. I. 207, 58 A. 658. In that case it was said:

"No one has a right to collect surface water in any considerable quantity on his own premises and then turn the same in a concentrated form upon the premises of his neighbor in such a manner as to cause him damage.

■ "If one accumulates surface water by artificial means so as considerably to increase the volume and detrimental effect with which it would flow on his neighbor's land, he thereby renders himself liable in an action of tort.

■ "In this connection we may observe that we fail to see that it is material whether the water thus collected would have flowed upon the plaintiff's land in a given case or not but for some artificial structure. For it is evident that while a given piece of land may receive a large amount of surface water without injury thereto when it gently flows thereon from natural causes, as it is alleged was the case here before the construction complained of, yet, when collected and discharged in considerable volume at a given point it may become very destructive and injurious."

See also *Rix* v. *Town of Alamogordo*, 42 N. M. 325, 77 P. (2d) 765; *McCarthy* v. *Village of Far Rockaway*, 3 App. Div. 379, 38 N. Y. S. 989; *Livingston* v. *McDonald*, 21 Iowa 160, 89 Am. Dec. 563; *Belcastro* v. *Norris*, 261 Mass. 174, 158 N. E. 535.

All of the above cases are aptly in point and the opinions are clear and informative.

■ The defendant emphasizes the fact that the plaintiff, in answer to questions propounded to him, said that the defendant's improvements on its lands were reasonable, and the use to which it had applied them was also reasonable, as was the location of streets and ways. These were general statements and serve, in our opinion, to accentuate the frankness of the plaintiff. But this does not impair the force of the main contentions of the plaintiff.

The defendant cites a number of cases but, as is said by the plaintiff, they are all distinguishable from the

case at bar. Some of them concern the physical activities of municipalities acting under statutory authority; in others, there was lacking the element of the concentration of waters, and in others the facts constitute the differential feature.

The refusal of the defendant's instruction F by the trial court was not error, as is seen by the statement we have made of the case; and the latter part of the instruction was covered by instruction G, which was granted.

We think that the defendant's assignment of error #2 concerning the argument made by plaintiff's counsel is without merit. Whatever of vice it contained was neutralized by the statement of the court to the jury, that they were to determine the case solely upon the question of whether there had been wrong done by the defendant; that they were not to be governed by sympathy, and that whether one litigant was large and potential and another the opposite had nothing to do with the rights and issues in the case.

In *Washington & Old Dominion Railway* v. *Ward's Adm'r*, 119 Va. 334, 89 S. E. 140, is this:

"A judgment ought not to be reversed for the admission of evidence or for a statement of counsel which the Court afterwards directs the jury to disregard, unless there is a manifest probability that the evidence or statement has been prejudicial to the adverse party. A different rule would result in fixing an intolerable handicap upon the *nisi prius* courts."

"Generally a new trial will be denied where improper argument has been checked by the Court and the jury has been instructed to disregard the improper statements." 29 Cyc. 776.

We think that the judgment of the trial court is right, and it is therefore

*Affirmed.*