**Baysal D. RIDDLE, Appellant,**

v.

**EXXON TRANSPORTATION COMPANY, Appellee.**

**No. 75–2298.**

United States Court of Appeals, Fourth Circuit.

Argued June 6, 1977.

Decided Sept. 27, 1977.

Sidney H. Kelsey, Norfolk, Va. (Kelsey & Kelsey, Norfolk, Va., on brief), for appellant.

Guilford D. Ware, Norfolk, Va. (Crenshaw, Ware & Johnson, Norfolk, Va., on brief), for appellee.

Before RUSSELL, WIDENER and HALL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The plaintiff, a welder employed by the Norfolk Shipbuilding and Drydock Corporation (hereinafter referred to as the Shipyard) was injured in a fire and gas explosion on the EXXON BANGOR while that vessel was undergoing repairs performed by the Shipyard under a contract with the vessel's owner, the defendant Exxon Transportation Company. He sued the shipowner for damages under the terms of the Longshoremen's and Harbor Workers' Compensation Act.[1] Following a jury verdict in favor of the defendant shipowner, the plaintiff has appealed. We affirm.

### I.

The Shipyard and the predecessor of the defendant Exxon entered into a contract for ship repairs to the EXXON BANGOR, along with certain other vessels. Under the contract, the vessel was delivered to the Shipyard, which assumed full responsibility for and control of the "detailed manner and method of doing" the repairs called for thereunder. The right of the shipowner was limited to approval of "the results obtained" by the Shipyard in making the repairs. Before the vessel was accepted by the Shipyard, it was "gas-freed" by the shipowner. The Shipyard verified the fact that the vessel was "gas-free" at time of delivery by having a Certificated Chemist, selected and paid by it, to test the vessel thoroughly and to certify that it was "gas-free." The responsibility for keeping the vessel "gas-free" thereafter rested upon the Shipyard. In discharging this responsibility, the Shipyard issued various instructions to its employees. Among these was a direction that "hot" work could only be performed in an area where there was a current certificate of the Chemist that such area was "gas-free." Any "manipulation of valves or closure equipment tending to alter conditions in pipe lines, tank or compartments subject to gas accumulation, unless specifically approved in the certificate, [would] void[s] the certificate" and "[r]eexamination of spaces so effected [would be] mandatory before hot work [could] begin." There is also a provision in such instructions that "[n]o spray painting shall be done in areas where hot work is in progress." All of these instructions include requirements, which, according to the plaintiff, were well known and understood as reasonable safety measures in the trade.

About 8:00 a. m. on the day of the accident the plaintiff began welding (which is hot work) on the outside of the vessel near an open hole about 14 inches in diameter, which extended through the outside plate into the sea chest leading into the pump room. Painters were engaged in work on the outside at the same time but, when they approached within about 40 feet of the place where plaintiff was working, they discontinued their work and passed over to a point about 40 feet beyond the hole leading to the pump room. In the meantime, the Shipyard Chemist had at the beginning of work that morning certified the pump room as free from gas and safe for welding. A short time later employees of the Shipyard began work manipulating the valves in the pump room. The Shipyard had also placed an exhaust fan on the outside of the pump room with plastic tubing down into the room and it was "sucking air out of the pump room." By early afternoon the plaintiff had completed his outside welding and went aboard to the pump room to engage in welding there. He observed a machinist

---

1. 33 U.S.C. § 901, *et seq.*

"standing around some valves up on the forward bulkhead of the pump room" and it looked to him as if he was "packing 'em." [2] And the riggers, engaged in the removal of the valves, realized that the plaintiff was doing "hot" work. The gas-free certificate for the room plainly stated it related only to conditions in the room at the time it was issued (*i. e.* 7:30 a. m.) and that, if any work on the valves connected with the piping was conducted thereafter, the certificate was void and, before any "hot" work was to be permitted in the room, a new gas test must be carried out and a new certificate secured. No new test, however, was made. Shortly after the plaintiff began his welding in the pump room, the explosion occurred and he was injured. At trial the evidence indicated one of two sources for the gas in the room which was ignited, causing the explosion. One source could have been the fumes of the painting drawn in by the suction of the exhaust fan; the other was gas released through the manipulation of the valves.

At the conclusion of the evidence, the District Court submitted the cause to the jury. A verdict was returned in favor of the defendant. From the judgment entered on such verdict, the plaintiff has appealed assigning error in the denial of a mistrial for misconduct of defendant's counsel during trial and error in a number of jury instructions given by the District Court.

## II.

The first claim of error in the trial raised by the plaintiff relates to a ruling made by the Court during the defendant's cross-examination of the plaintiff and to the failure of the District Court to grant a mistrial at that point. Counsel for the defendant inquired if the Shipyard had not paid his medical bills. An objection was immediately made by plaintiff's counsel to the question and the plaintiff did not answer. At the request of plaintiff's counsel, a recess was taken during which such counsel moved for a mistrial, contending that the defendant's question represented an impermissible reference to collateral benefits, thereby prejudicing irreparably plaintiff's case. The District Court denied the motion and recalling the jury, instructed them specifically:

> "THE COURT: Ladies and gentlemen of the jury, just immediately prior to the recess some question was asked of the witness concerning doctors' or medical expenses, as to whether he had paid them or whether or not some source had paid them, his employer. You will disregard that completely. That's not a part of this case. That's not to be considered by you. Any medical expenses which he has incurred he is entitled to recover in this action, if you decide that he is entitled to recover. So, you'll disregard any statement or any question or any comment made in that regard."

While the rule has been recently criticized,[3] the present rule is that evidence of the receipt of collateral benefits by a plaintiff in a negligence case is not admissible. This was expressly held in *Tipton v. Socony Mobile Oil Co.* (1963) 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4, *reh. den.* 375 U.S. 936, 84 S.Ct. 328, 11 L.Ed.2d 268; and *Eichel v. New York Central R. Co.* (1963) 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307. Nothing in the new *Federal Rules of Evidence* authorizes departure from the rule so declared. But neither in *Tipton* nor in *Eichel* was the court called on to consider whether such error may be cured by an appropriate instruction, which is the issue here.[4] In *Tip-*

2. The plaintiff was more explicit in his deposition before trial. At that time, he testified: "They (the co-workers) were taking out a valve where I was welding in the insert. They were taking the valve out to go to the shop, that one valve, where I was working."

3. *Blake v. Delaware and Hudson Railway Company* (2d Cir. 1973) 484 F.2d 204, 207–8 (concurring opinion of Friendly, J., and dissenting opinion of Lombard, J.)

4. A recent case in which the same situation prevailed is *LaMade v. Wilson* (1975) 168 U.S. App.D.C. 108, 512 F.2d 1348. There the trial court had ruled such evidence admissible. The issue of a curative instruction was not raised and the only issue was one of admissibility.

*ton,* for instance, the District Court had ruled that the introduction into evidence of collateral benefits received by the plaintiff was proper and the issue before the Supreme Court was limited to the correctness of that ruling of admissibility. In *Eichel* the District Court had rejected such evidence but the Court of Appeals found such ruling erroneous. Again, the issue before the Supreme Court was merely the admissibility of that evidence. But in *Tipton,* the Court, while finding the evidence inadmissible, appeared to recognize that in a proper case an appropriate instruction could cure the error. Thus the Court in that case was careful to add that the Court "did not frame a cautionary instruction." It would seem proper to deduce from this statement of the Court that if such a "cautionary instruction" had been given, a different result could well have followed.

The most nearly analogous situation to an improper reference during trial to collateral benefits is that which arises when the fact that the defendant is protected by liability insurance has been improperly injected into the case at trial. Indeed, in *Eichel,* the Supreme Court recognized that the two situations were similar and justified similar treatment. Thus, it said:

"It has long been recognized that evidence showing that the defendant is insured creates a substantial likelihood of

misuse. Similarly, we must recognize that the petitioner's receipt of collateral social insurance benefits involves a substantial likelihood of prejudicial impact." [5]

And the authorities seem to do just this, to treat the two situations as governed by like rules.

It seems to be settled in either instance, whether the challenged evidence relates to collateral benefits or to insurance, a cautionary instruction in a proper case will cure any error in the introduction of such an issue at trial. The rule, as to when a cautionary instruction will cure such an error appears to be that "in the absence of anything indicating that the verdict returned was adversely affected by such statements or remarks, or that counsel made persistent and studied attempts to bring the objectionable matter before the jury, prompt action in striking improper references to the defendant's insurance from the record coupled with instructions admonishing the jury to disregard such matter, sufficiently protects the defendant's right." [6] Whether, under the circumstances of the particular case the error has been cured by a cautionary instruction is normally "a matter for the proper exercise of the sound discretion of the trial court," [7] and "only in the event of a manifest abuse of judicial discretion should the appellate

---

**5.** 375 U.S. at 255, 84 S.Ct. at 317.

**6.** 58 *Am.Jur.* § 530, p. 124.

For an instance in which an appropriate instruction cured an impermissible reference to collateral benefits, *see Edwards v. Steinns* (4th Cir. 1953) 207 F.2d 734, 735. To the same effect, are *Mixon v. Lovett* (1970) 122 Ga.App. 517, 177 S.E.2d 826, 827, and *Finley P. Smith, Inc. v. Schectman* (Fla.App.) 132 So.2d 460, 466; *cf. Franklin v. Sandersville Railroad Company* (5th Cir. 1971) 445 F.2d 270, 271 (holding that a verdict of no liability made any reference to collateral benefits harmless.)

The point, however, has been most often presented in cases where the existence of insurance had been introduced into a jury trial. For instances where a cautionary instruction cured an impermissible reference to insurance: *Jupollo Public Service Co. v. Grant* (4th Cir. 1930) 42 F.2d 18, 20; *Gortz v. Ravenel* (1923) 127 S.C. 505, 506, 121 S.E. 369; *Goldstein v. Gontarz* (Mass.1974) 309 N.E.2d 196, 204; *Car-*

*olina Timber Management Company, Inc. v. Bell* (1974) 21 N.C.App. 143, 203 S.E.2d 339, 340, *cert. denied* 285 N.C. 376, 205 S.E.2d 97; *Hixson v. Barrow* (1975) 135 Ga.App. 519, 218 S.E.2d 253, 257; *Sheley v. Guy* (1975) 29 Ill. App.3d 361, 330 N.E.2d 567, 571; *Patranella v. Scott* (Tex.Civ.App.1963) 370 S.W.2d 922, 923; *Colwell v. Jones* (1961), 48 Tenn.App. 353, 346 S.W.2d 450, 456; *Dunaway v. Darnell* (Ky. 1957) 302 S.W.2d 122, 123; *Rust v. Watson* (Ind.App.1966) 215 N.E.2d 42, 51; *Bryar v. Wilson* (1964) 152 Conn. 162, 204 A.2d 831, 832 ("The time when the mere mention of insurance before a jury in the trial of a negligence case automatically called for a mistrial has long since passed"); *Ragon v. Day* (1957) 228 Ark. 215, 306 S.W.2d 687, 689; *Clark v. Hudson* (1957) 265 Ala. 630, 93 So.2d 138, 141; *Christianson v. Kramer* (1965) 257 Iowa 974, 135 N.W.2d 644, 648.

**7.** *Ibid.* § 530, p. 125.

court interfere,"[8] with the exercise of that discretion. This is so because the trial judge can best evaluate the atmosphere of the trial and the possibility of prejudice.

Under the circumstances of this case, we find no abuse of discretion in the denial by the District Court of a mistrial. When objection was made to the question, the defendant promptly desisted. Equally promptly the trial judge sustained the objection. The jury was properly admonished to disregard the reference. Moreover, it is difficult to conclude that the plaintiff was prejudiced, since the evidence, if admitted, would have gone only to the amount of damages and not to liability, and the jury found that there was no liability, thereby eliminating any question of a reduction in damages because the Shipyard had paid plaintiff's hospital bills. *See, Franklin v. Sandersville Railroad Company, supra* (445 F.2d at 271).

### III.

The other grounds for appeal have to do with the District Court's jury instructions. The first of these is directed at the Court's instruction that "[t]he primary responsibility for the safety of the plaintiff and the other men engaged in making the repairs on the EXXON BANGOR rested upon the shipyard and not upon the shipowner, Exxon." Such instruction is not unusual in cases of this type; it is substantially the instruction used by other courts in similar cases.[9] But, irrespective of its use in other cases, the plaintiff argues it is an erroneous instruction because, under the 1972 Amendments, the liability of a vessel in a third-party action is determined by maritime negligence concepts, which would, he claimed, impose upon the vessel an absolute non-delegable duty to provide a reasonably safe place to work for workmen employed by a stevedore or a shipyard. The argument of the plaintiff is substantially that stated in the District Court's instruction reviewed in *Marant v. Farrell Lines, Inc.* (3d Cir. 1977) 550 F.2d 142, 144. The instruction of the District Court was that "[t]he responsibility for the safety of the longshoreman lies concurrently or jointly with the longshoreman's employer, and with the shipowner." In bluntly disapproving such an instruction, the Circuit Court in its opinion said: "To say that responsibility is concurrent or joint is plainly inconsistent with the intention of the Act to place primary responsibility on the stevedore."[10] This Court had earlier reached the same conclusion in *Anuszewski v. Dynamic Mari-*

---

8. 58 *Am.Jur.* § 530, p. 125; *Neda Const. Co., Inc. v. Jenkins* (1976) 137 Ga.App. 344, 223 S.E.2d 732, 736, *see, also, Third Buckingham Community v. Anderson* (1941) 178 Va. 478, 17 S.E.2d 433, 437:

"'A judgment ought not to be reversed for the admission of evidence or for a statement of counsel which the court afterwards directs the jury to disregard, unless there is a manifest probability that the evidence or statement has been prejudicial to the adverse party. A different rule would result in fixing an intolerable handicap upon the nisi prius courts.'" [Quoting from *Washington and Old Dominion Railway v. Ward's Adm'r*, 119 Va. 334, 89 S.E. 140, 142.]

9. *See, for instance, Ramirez v. Toko Kaiun K.K.* (N.D.Cal.1974) 385 F.Supp. 644, 653; *Lucas v. "Brinknes" Schiffahrts Ges.* (E.D.Pa. 1974) 379 F.Supp. 759, 768.

In the first case, the Court said:

"The primary responsibility for the safety of a longshoreman lies with the stevedoring company."

In *Lucas*, the Court said:

"* * * It is clear, however, that Congress decided that the primary duty to provide a safe place to work is on the stevedore."

In *Brown v. Ivarans Rederi A/S* (3d Cir. 1976) 545 F.2d 854, 860 (U.S. appeal pending), the Court said:

"* * * However, express language in the statute and the legislative reports accompanying the 1972 Amendments amply demonstrate that for reasons of policy the major responsibility for the proper and safe conduct of the work was to be borne by the stevedore."

10. While Gilmore and Black in *The Law of Admiralty*, 453–55 (2d Ed. 1975) would support plaintiff's view, it is alone in that construction of the Amendments. Thompson, *Duty Owned by Shipowner Under 1972 Amendments, etc.*, 6 *Journal of Maritime Law and Commerce*, 643, 648–52 (1975).

Both the final Senate and House reports support the conclusion reached in *Farrell*. They state:

*ners Corp., Panama* (4th Cir. 1976) 540 F.2d 757, *cert. denied* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545, and *Bess v. Agromar Line* (4th Cir. 1975) 518 F.2d 738.[11] In both of these cases, we held, in keeping with the manifest legislative purpose, that the Amendments were intended to and did relieve the shipowner of a non-delegable duty to furnish a safe place to work and declared that its liability in a third-party action, in which the stevedore or ship repairer was "viewed generally as an independent contractor," was governed by "land-based" negligence principles and not by "maritime negligence concepts." There was accordingly no error in the instruction.

### IV.

 The District Court instructed the jury as follows:

"The shipowner has the duty to exercise reasonable care for an invitee, such as Plaintiff Riddle here, who has come aboard the ship with the permission of the owner to do work and to warn of any latent or hidden dangers of which the shipowner knows or should know by the

exercise of ordinary care of which are unknown to the plaintiff or to the plaintiff's employer."

The plaintiff would fault this instruction for improperly imputing to the plaintiff-employee the "negligence of his employer." In challenging the instruction on this basis the plaintiff is on untenable ground. The objection assumes that the instruction related to a defense of contributory (in admiralty comparative) negligence or assumption of risk (a defense not available to the vessel under the 1972 Amendments).[12] The plaintiff, however, misconceives the purport or intent of the instruction, which was not directed at a defense of contributory negligence or of assumption of risk; it was a statement of the duty of a vessel in favor of the employees of an independent contractor, such as a stevedore or ship repairer, with respect to "open and obvious" defects on the vessel. Applying land-based law, as declared in the Restatement, the shipowner "owes no duty to the [independent] contractor's employees (such as the plaintiff in this case) except in respect of concealed or hidden dangers known to him or which ought to have been known to him,"[13] or, to state

"The purpose of the amendments is to place an employee injured aboard a vessel in the same position * * * [as of land-based] * * * and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness', 'nondelegable duty', or the like." H.R.Rep.No.92–1441, 92nd Cong., 2d Sess. (1972) 2 U.S.Code Cong. & Admin.News, p. 4703. Senate Report No. 92–1125, 92d Cong., 2d Sess., 2 (1972).

**11.** To the same effect are: *Marant v. Farrell Lines, Inc., supra,* 550 F.2d at 144; *Gay v. Ocean Transport & Trading, Ltd.* (5th Cir. 1977) 546 F.2d 1233, 1238; *Brown v. Ivarans Rederi A/S, supra,* 545 F.2d at 860; *Napoli v. [Transpacific Carriers, etc.] Hellenic Lines* (2d Cir. 1976) 536 F.2d 505, 506–7.

**12.** *See* S.Rep. at 12:

"[T]he Committee intends that the admiralty rule which precludes the defense of 'assumption of risk' in an action by an injured employee shall also be applicable" in § 905(b) actions.

For like language in the H.Rep., *see* 4705.

**13.** 1A, Benedict on Admiralty, § 114.

A somewhat broader definition of the vessel's duty was stated in a pre-1972 negligence case, cited with approval in the post-1972 case of *Ramirez v. Toko Kaiun K.K., supra* (385 F.Supp. 646) of *Hugev v. Dampskisaktieselskabet International* (C.D.Cal.1959) 170 F.Supp. 601 at 610–11, *aff'd,* (9 Cir.), 274 F.2d 875, *cert. denied,* 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147 (1960):

"The surrounding circumstances of fact, and that of law just recited, prompt the holding that, absent express provision to the contrary, the shipowner owes to the stevedoring contractor under the stevedoring contract the implied-in-fact obligations: (1) to exercise ordinary care under the circumstances to place the ship on which the stevedoring work is to be done, and the equipment and appliances aboard ship, in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care under the circumstances to load or discharge the cargo, as the case may be, in a workmanlike manner and with reasonable safety to persons and property; and (2) to give the stevedoring contractor reasonable warning of the exist-

it more specifically, he has, under the traditional view, no duty with respect to conditions of the vessel "which are open and comprehensible to any reasonably careful man." [14] Because there is under the traditional rule no duty resting on the vessel for "open and obvious" conditions "comprehensible to any reasonable man," there is no liability therefor. For this reason, the instruction, substantially as given here, has been approved in many cases.[15]

In recent years, considerable confusion has arisen about the propriety for the continued application of the traditional rule of complete and absolute immunity from liability by a landowner or shipowner to an invitee for "open and obvious" conditions of danger on the land or vessel. The Second Restatement has taken note of this and has qualified somewhat the traditional rule of complete immunity by adding § 343 and 343A. While a number of authorities continue to find the shipowner not liable in a third-party action without further inquiry if the danger or condition causing injury was open and obvious, there is what one

commentator has described as "a smaller but more carefully reasoned number" of cases which, applying as they understood § 343 and § 343A of the Second Restatement, "insist that the shipowner might nevertheless be liable in such circumstances if he should have realized that despite such knowledge or obviousness plaintiff would not be protected." [16] Perhaps the clearest expression of this latter view was set forth in the recent case of *Napoli v. Hellenic Lines, supra* (536 F.2d at 509). As stated in that case, the obligation of the vessel for injuries to invitees, such as a longshoreman or ship repair employee, with respect to open and obvious conditions of danger on the vessel exists "only for injuries resulting from obvious dangers which it should reasonably anticipate that the longshoremen (or shipyard employee) would be unable to avoid." And, contrary to the traditional view, this principle, it seems, would apply to any obvious dangerous condition which might arise during the performance of the work of the independent contractor. However, even under the modern rule, a vessel is not liable for "open and obvious" danger-

ence of any latent or hidden danger which has not been remedied and is not usually encountered or reasonably to be expected by an expert and experienced stevedoring company in the performance of the stevedoring work aboard the ship, if the shipowner actually knows or, in the exercise of ordinary care under the circumstances, should know of the existence of such danger, and the danger is one which the shipowner should reasonably expect a stevedoring contractor to encounter in the performance of the stevedoring contract. [Citing cases.]"

**14.** *Ibid.* § 112.

The same principle was stated in *Fedison v. Vessel Wislica* (E.D.La.1974) 382 F.Supp. 4 at 7:

"* * * It is black-letter law that the owner of a premise owes no duty to warn an invitee of a defect or danger which is known to him or which is as well known to the invitee as to the owner, or which is obvious or which should be observed by the invitee in the exercise of ordinary care."

A critic of the rule has stated:

"The doctrines, borrowed from the land-based law with apparent congressional imprimatur, that have proved most detrimental to employee actions in this context are the 'open and obvious danger' idea and the concomitant notion that the shipowner is ordi-

narily free, at least after turning over a reasonably safe ship, to delegate fully the problem of longshoreman safety to the stevedore." Robertson, *Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* 7 Jour. of Maritime Law and Commerce 447 at 473.

**15.** *Cummings v. "Sidarma" Soc.* (E.D.La.1976) 409 F.Supp. 869, 872–73; *Fedison v. Vessel Wislica, supra* (382 F.Supp. at 7); *Hite v. Maritime Overseas Corporation* (E.D.Tex.1974) 380 F.Supp. 222, 227.

**16.** Robertson, *Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* 7 Jour. of Maritime Law and Commerce 447, 456–57. *See, also,* Note, *Duty Owed by Shipowner under 1972 Amendments to Longshoremen's Act is That of Land Based Premises Owner to Business Invitee,* 6 Jour. of Maritime Law and Commerce 643 (1975); Note, *Negligence Standards Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* etc., 21 Vill.L.Rev. 244 (1976); and Note, *The Injured Longshoreman vs. The Shipowner After 1972, etc.,* 28 Hast. L.J. 771 (1977).

ous conditions, whether existing at time control of the vessel is relinquished by the vessel or arising afterwards with the knowledge of the vessel, if the danger is such that the stevedore or shipyard would be expected to correct the condition in the course of discharging its responsibility for the safety of the longshoreman or shipyard worker. For illustrations of this, see *Anuszewski v. Dynamic Mariners Corp., supra* (540 F.2d 757); *Frasca v. Prudential-Grace Lines, Inc.* (D.Md.1975) 394 F.Supp. 1092, 1101; and cases cited by Robertson, *ibid.* at 472–3. Robertson explains these decisions thus:

> "The consistent philosophy of these decisions is that in the ordinary situation shipowners are in no position to learn of unsafe conditions or methods arising during the stevedore's operations; when shipowners do learn of such dangers, ordinarily the stevedore and his employees will have an equal or greater awareness, so that the danger can be said to be open and obvious; and that the safety of stevedoring and other such operations is the primary and usually the sole responsibility of the stevedore." *Ibid.*, p. 473.

But whether the statement of the District Court in the challenged instruction was erroneous for not qualifying the vessel's immunity for "open and obvious" dangers in line with the modern rule is irrelevant in this case and its use by the District Court would, if erroneous, be at most harmless error. This is so because plaintiff's injuries resulted solely from the negligence of the Shipyard and its employees; and, irrespective of the language of § 343 and § 343A of the Second Restatement, a vessel is unquestionably exempt under both the letter and the intent of the 1972 Amendments from any liability for injuries resulting from the negligence of the Shipyard and its employees. And this is so, irrespective of whether the condition resulting in plaintiff's injuries was "open and obvious"

or not. Such has recently been the clear holding in four well-reasoned decisions. *Hurst v. Triad Shipping Co.* (3d Cir. 1977) 554 F.2d 1237; *Munoz v. Flota Merchante Grancolombiana, S.A.* (2d Cir. 1977) 553 F.2d 837; *Gay v. Ocean Transport & Trading, Ltd.* (5th Cir. 1977) 546 F.2d 1233; and *Teofilovich v. d'Amico Mediterranean/Pacific Line* (C.D.Cal.1976) 415 F.Supp. 732.

In *Hurst*, the longshoremen were injured as a result of a defective safety catch on a crane hook being used by the stevedore. It was claimed that an officer of the vessel was present at the time and that it was a maritime custom for a vessel to have present an officer to observe and inspect the stevedoring operation as it proceeded. The longshoremen contended that the vessel, under those circumstances, should have observed the dangerous condition and stopped the work until the safety catch was made operative. It was admitted by the vessel that one of its officers was present throughout the stevedoring operations but the officer testified he had not observed that the crane hook did not have a workable safety catch. The District Court directed a verdict for the vessel in the § 905(b) negligence action brought by the longshoremen. On appeal, the plaintiffs, among other claims, contended that under § 318 of the Second Restatement (1965),[17] the vessel owed them the duty "to see that the stevedore did not endanger them by using an unsafe hook on the stevedore's crane" and that, since it should have known about the unsafe activity of the stevedore, the vessel should "have exercised the ship's ultimate authority and ordered the unsafe method of work halted."[18] The Court found § 318, § 343 and § 343A "inapposite,"[19] because, as construed by the plaintiffs, those sections would result in a holding directly contrary to the positive declaration and intent of § 905(b) that the vessel was not to be liable

---

**17.** Before the District Court, the plaintiff had relied also on § 343 and § 343A of the Restatement. 554 F.2d 1249, n. 35.

**18.** 554 F.2d 1248.

**19.** For a similar ruling, based on a most comprehensive discussion of the matter, *see Teofilovich v. d'Amico Mediterranean/Pacific Line, supra* (415 F.Supp. at 735–9).

for the negligence of the stevedore.[20] It declared:

"We believe that the appropriate section of the Restatement is section 409, which applies to independent contractors and comports with congressional intent:

Except as stated in §§ 410–429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants.

*Accord,* W. Prosser, The Law of Torts § 71 (4th ed. 1971). We think that this general rule well expresses the congressional concern for the practical operation of the Longshoremen's Act: shipowners 'shall not be liable in damages for acts or omissions of stevedores or employees of stevedores . . . Therefore, unless one of the recognized exceptions, §§ 410–29, to the general rule that the employer of the contractor has no duty applies, our application of § 409 means that Triad cannot be held liable for the stevedore's unsafe method of operation in this case.

"The exceptions stated in sections 416 through 429 of the Restatement

do not rest upon any personal negligence of the employer. They are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer himself has been at fault. They arise in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor. The liability imposed is closely analogous to that of a master for the negligence of his servant.

The statement commonly made in such cases is that the employer is under a duty which he is not free to delegate to the contractor. Such a 'non-delegable duty' requires the person upon whom it is imposed to answer for it that care is exercised by anyone, even though he be

an independent contractor to whom the performance of the duty is entrusted. Restatement (Second) of Torts, Topic 2, Introductory Note at 394 (1965). Clearly, sections 416 through 429 incorporate precisely that concept of nondelegable duty which, as we observed above, Congress sought to eliminate in the relations between shipowner and stevedore. *Brown, supra,* 545 F.2d at 858–61; *accord, Teofilovich v. d'Amico Mediterranean/Pacific Line,* 415 F.Supp. 732 (C.D.Cal.1976). Therefore, the exceptions to the rule of section 409 contained in sections 416 through 429 cannot apply to the case *sub judice.*"[21]

In *Hurst,* also, the Court found that the right to inspect the work of the stevedore and the ultimate authority to halt the work if not done according to the agreement did not represent such control of the work of the stevedore as to create a basis for the vessel's liability. It further said that the

"creation of a shipowner's duty to oversee the stevedore's activity and insure the safety of the longshoremen would, as in the case of § 318, *see* notes 31–32 *supra* and accompanying text, saddle the shipowner with precisely the sort of non-delegable duty that Congress sought to eliminate by amending section 905(b). Every shipowner has the authority to oversee stevedoring operations. If that authority, without more, suffices to charge the shipowner with a responsibility for detecting unsafe methods of operations and warning the longshoremen about them, then shipowners will be back in their pre-1972 position."[22]

It proceeded to distinguish our own case of *Butler v. O/Y Finnlines, Ltd.* (4th Cir. 1976) 537 F.2d 1205, *cert. denied* 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 180, and *Croshaw v. Koninklijke Nedlloyd, B. V. Rijswijk* (D.Or. 1975) 398 F.Supp. 1224, because in those cases "the shipowner's participation in the operations is clear, direct, and of significant proportions." It noted in particular that in

**20.** There is a similar provision with reference to ship repair operators.

**21.** 554 F.2d at pp. 1250–1.

**22.** 554 F.2d at 1250, n. 35.

*Butler* the ship's mate had "over longshoreman's protest, personally directed particular form of stowage that resulted in injury."[23]

In *Munoz,* the stevedore, in the course of its work, had "stowed the cargo in such a manner as to create a latent, dangerous condition upon which one of its employees was injured." In finding the shipowner not liable, the Court, after distinguishing *Napoli,* said:

> " * * * We therefore prefer the guidance afforded by *Gay v. Ocean Transport & Trading,* 546 F.2d 1233 (5th Cir. 1977) where, in two related cases, the Fifth Circuit refused to hold a shipowner liable for injuries sustained by longshoremen as a direct result of their employers' negligence in failing properly to ventilate the hold and omitting adequately to secure pallets on the ship's deck. The court recognized, as we do, that it would be inimical to the intent of Congress to charge the shipowner with the stevedore's wrong. *See also Bess v. Agromar Line,* 518 F.2d 738 (4th Cir. 1975) (stevedore breaches his contractually created duty to supply dunnage boards). *Cf. Marant v. Farrell Lines,* 550 F.2d 142 (3d Cir. 1977) (stevedore bears primary responsibility for safety of longshoremen).

> "Thus, it is our judgment that a shipowner cannot be liable in damages when he relinquishes control of the hold, then in a reasonably safe condition, to an experienced stevedore pursuant to a contract to supply services within its normal competence, *cf.* § 413, Restatement of Torts 2d (work of an independent contractor that creates 'a peculiar unreasonable risk of physical harm . . . unless special precautions are taken . . .'), and the stevedore's negligence creates a latent, dangerous condition, unknown to the owner, upon which a longshoreman is injured. To hold otherwise, in our view, risks return to the concept of liability without fault for shipowners, which Congress so emphatically and recently rejected."[24]

As the statement in *Munoz* indicates, *Gay,* which was a two-part case, presented in one of those cases a situation almost identical with that involved here. The injured longshoreman was operating a propane forklift in an unventilated reefer compartment. A blower had been brought aboard by the stevedore for the purpose of removing the carbon monoxide that would accumulate in the reefer during the work. Unfortunately the blower was not properly connected and the longshoreman suffered carbon monoxide poisoning. The Court held that the dangerous condition in the reefer was due to the negligence of the stevedore and "Section 905(b) instructs that a longshoreman does not have a cause of action against a vessel if his injury 'was caused by the negligence of persons engaged in providing stevedoring services to the vessel.' "[25] It accordingly, sustained a directed verdict in favor of the vessel. In the other case involved in *Gay,* the Court said:

> " * * * Even though the crew of the vessel was aware of the dangerous condition presented by the stack of pallets, it was the stevedore that failed to tie the pallets down and then carelessly knocked one into the hold. This was not the type of danger that must be faced notwithstanding knowledge. The finding of the district court that the stevedore's negligence was the sole proximate cause of Guerra's injury is not clearly erroneous."[26]

Nor do the decisions construing § 905(b) to immunize the vessel from liability for conditions created by the negligence of the shipyard or stevedore differ from the negligence rule long recognized in this Circuit in admiralty cases. *See White v. United States* (4th Cir. 1968) 400 F.2d 74, 76, and *Van Horn v. Gulf Atlantic Towing Corporation* (4th Cir. 1968) 388 F.2d 636, 639. In

**23.** 554 F.2d at 1252, n. 38.

**24.** 553 F.2d at 841.

**25.** 546 F.2d at 1239–40.

There is a similar provision with reference to ship repairers.

**26.** 546 F.2d at 1242.

*White,* the Court declared specifically that the immunity extended to those "instances in which the work of repair created the unsafe condition." And in *Van Horn,* Judge Sobeloff, in discussing *West v. United States* (1959) 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161, said:

"* * * Control of the vessel was a vital test in that case because the dangerous condition of which the injured drydock worker complained was caused by a fellow drydock worker after custody of the ship had been turned over to the repairman. Specifically noting this, the Court said: 'It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, *and the work of repair in effect creates the danger which makes the place unsafe.*'" (Italics in opinion.) [27]

It follows, therefore, both under the 1972 Amendments and under negligence principles recognized before the enactment of those Amendments that where the dangerous condition resulting in injuries to a longshoreman or ship repair worker was due to the negligence of the stevedore or shipyard without the knowledge or participation of the shipowner, the latter was not liable.

The plaintiff in this case apparently recognized the weakness of his position if the dangerous condition resulting in his injuries in the pump room could be said to be due to the negligence of the Shipyard. He accordingly argued that the vessel was not delivered to the Shipyard in a reasonably safe condition because it was not "gas-free" at the time. The initial difficulty with this contention is that there is no evidence in the record to support it. Both the Shipyard and the shipowner agreed that, before the Shipyard assumed control of the vessel, there should be a careful, scientific determi-

nation made that the vessel was "gas-free." Such determination was required to be made by a Certificated Chemist, and, since the Shipyard was the one accepting subsequent responsibility, that Certificated Chemist was to be selected and compensated by the Shipyard. The test was made in this case by a Certificated Chemist, who reported that the vessel, as delivered to the Shipyard, was "gas-free." There is no question raised of the competency of the chemist or the thoroughness of his test. The plaintiff suggests, however, that, because gas was in the vessel's pipes five days after the test, the test must have been in error. But the plaintiff's own expert witness confirmed the other testimony that, even though the vessel may have been "gas-free" five days earlier, gas can later accumulate in the pipes and no doubt this is the reason for the safety requirement, recognized in the trade and incorporated in the employee instructions of the Shipyard, that always, throughout the ship repairs, "hot" work could not be performed in any area which had not been contemporaneously certified as "gas-free." [28]

The dangerous condition which resulted in plaintiff's injuries was manifestly due to the negligence of the Shipyard and its employees. Whether the gas was introduced into the room through the manipulation of the valves or drawn into the room from the painting outside, it was the Shipyard and its employees who were responsible for the dangerous condition thus created and it was the responsibility of the Shipyard to have seen that the pump room was free of gas before permitting the plaintiff to engage in "hot" work in that room. The dereliction was unquestionably that of the Shipyard and its employees done in the course of their performance of the Ship-

27. 388 F.2d at 639.

See, also, *Baum v. United States* (5th Cir. 1970) 427 F.2d 215, 219, *cert. denied* 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155.

28. The fact that the Shipyard recognized a duty to engage in a continuous checking for gas of all areas where "hot" work was to be performed would suggest that this was an accepted danger for which the shipowner could

reasonably expect that the Shipyard would take steps to correct in discharge of its own primary responsibility for the safety of its employees and the vessel would accordingly be protected from liability. *See* page 19; *Frasca v. Prudential-Grace Lines, Inc., supra* (394 F.Supp. 1092); *Fedison v. Vessel Wislica, supra* (382 F.Supp. 4).

yard's contractual obligations, and the "open and obvious" doctrine, if erroneously stated by the District Court, would have been immaterial to the adjudication of this case. For this reason, it is clear, as we have already noted, that any error in the instruction with reference to "open and obvious" conditions would have been harmless since it could not have been prejudicial to plaintiff's rights. There is no difference between this case and that of *Gay.* The District Court stretched the law to permit the submission of the action to the jury. The plaintiff probably received more than his due. In any event, there was no prejudice suffered by him because of the instruction of which he complains.

## V.

 Finally, the plaintiff argues that the District Court erred in instructing the jury:

"Therefore, if you believe from the evidence that the plaintiff's accident was caused by the manner in which the plaintiff and his fellow workers performed their duties in making the repairs in the main pump room, including the removal of the valves, the welding of the flange to the sea chest, the painting in and about the sea chest opening, and if this was the efficient cause of the accident rather than any negligence of the defendant, then, in such event, there is no liability imposed upon the defendant, Exxon."

So far as we can ascertain, the plaintiff did not except to this language in the charge and this is sufficient reason to disregard this claim of error. Nor for that matter do we see any prejudice to the plaintiff and his contentions as against the vessel by the charge. Apparently, the plaintiff's objection to the instruction is directed at the Court's use of the term "efficient" rather than "proximate." But, if this is the objection, it is plainly without merit. Actually,

"efficient" is a more accurate term than "proximate" for describing the cause for which a negligent party may be legally liable. 57 *Am.Jur.,* § 130, p. 481; *Bole v. Pittsburgh Athletic Co.* (3d Cir. 1913) 205 F. 468, 471 (" * * * cause of an injury to which legal liability attaches may be better described as the 'efficient' cause."); *Columbia Creosoting Co. v. Beard* (1912) 52 Ind. App. 260, 99 N.E. 823, 825 (" 'the proximate cause of an injury is * * * the efficient cause * * *.' ") *Bickford v. Pacific Electric Ry. Co.* (1932) 120 Cal.App. 542, 8 P.2d 186, 190.[29]

## CONCLUSION

The judgment of the District Court is accordingly

AFFIRMED.

WIDENER, Circuit Judge, concurring:

I concur in the result in this case and also in the opinion.

I add a note only to point out that part II of the opinion, which I consider to be a correct statement of the law, seems to me to be irreconcilable with, and, since we do not overrule absent an en banc court, will certainly limit to its facts, *Leathers v. General Motors Corp.,* 546 F.2d 1083 (4th Cir. 1976), where, in a less strained situation, we held a curative instruction offered by the trial court could not correct a rather innocuous, unobjected to, golden rule type argument.

---

**29.** In 57 *Am.Jur.,* § 130, the editor puts it: " * * * Since the proximate cause as an element of liability for negligence is not necessarily dependent upon nearness in time or distance, with which proximity is most readily associated, but is ordinarily used to describe or characterize a cause without which the accident could not have happened, perhaps 'primary' or 'efficient' would be more descriptive of the cause of which the law takes cognizance than 'proximate'."