**Charles EVANS, Plaintiff-Appellee,**

v.

**TRANSPORTACION MARITIME MEXICANA SS "CAMPECHE",**
**Defendant-Appellant.**

**No. 42, Docket 80–7081.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 15, 1980.

Decided Jan. 5, 1981.

Joseph T. Stearns, New York City, (Sandra R. M. Gluck, Walker & Corsa, New York City, of counsel), for defendant-appellant.

Irving B. Bushlow, Brooklyn, N. Y., for plaintiff-appellee.

Before FRIENDLY and MESKILL, Circuit Judges, and BONSAL, District Judge.*

MESKILL, Circuit Judge:

Charles Evans, a longshoreman formerly employed by Pittston Stevedoring Company (Pittston), was injured while loading the CAMPECHE, a vessel owned by the defendant, Transportacion Maritime Mexicana (the shipowner). Pittston's insurer awarded Evans $60,484.86 in settlement of his claim for compensation under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950 (1976). Subsequently, pursuant to § 905(b) of that Act, Evans brought this third-party negligence action against the shipowner in the United States District Court for the Southern District of New York. After a five-day trial, the jury returned a verdict of $80,000 in favor of Evans. Judge Platt entered judgment on the verdict and denied the shipowner's motion for judgment n. o. v. Because of errors in the charge, we reverse.

## BACKGROUND

The events leading up to this lawsuit began the day before the accident, when a longshoring crew under the supervision of Mr. Richard Mills, a Pittston Foreman, began loading the # 2 hold of the CAMPECHE. The jury would have been justified in finding the facts as follows. The flooring of the # 2 hold consisted of wooden planking laid on top of a steel deck. Apparently, the purpose of this planking was to prevent heavy cargo from piercing the oil and ballast tanks located immediately below. On the day before the accident, Pittston was using "hi-los"[1] to move cargo in the # 2 hold. Customarily, steel plates were laid down in these circumstances to protect the flooring from the machinery, but Pittston was not using them, either because there not enough plates or because they were the wrong size. Mills discovered that when the hi-los ran across the uncovered boards, some of the planks would pop up or shift. Accordingly, he ordered his men to nail plywood panels (dunnage) to the floor to eliminate the problem. At the end of the day, the port captain, an employee of the shipowner, told Mills that he wanted the # 2 hatch worked in the morning. Mills replied, "I am not going back to the hatch. That is, if I have to come back and if we have to work under the same conditions." The port captain did not withdraw his request, nor did he instruct the ship's crew to repair the floor.

On the day of the accident, Mills apparently had a change of heart, for he told Evans, that day's "hatch boss" for the # 2 hatch, "to go ahead and proceed with the job moving freight" into hatch # 2. The port captain, who was present when this order was given, did not try to countermand Mills' instruction. Just before the accident the holdman complained—in the presence of the port captain and the mate—that the floor was "torn up" and spotted with grease. Evans asked the ship personnel to try to find some dunnage, but they failed to

---

* Honorable Dudley B. Bonsal of the United States District Court for the Southern District of New York, sitting by designation.

1. A "hi-lo" is a type of forklift used by stevedores to move cargo around inside the hold of the ship.

produce any. He then complained to the port captain and to Mills that dunnage was needed,[2] and proceeded with Mills and the ship's mate to search the ship and an adjacent pier for dunnage. Evans returned empty-handed and again complained about the floor to the mate and Mills, whereupon he testified that "they told me we have to work because . . . the ship had to go out that afternoon."[3] Shortly after this dictate, Evans lost his footing and sustained the injuries which are the subject of this suit.

## DISCUSSION

In attempting to determine the scope of a shipowner's liability under the LHWCA, courts have had to grapple with a problem inherent in the tripartite relationship among shipowner, stevedore and longshoreman: the extent to which a shipowner may reasonably rely on the stevedore to fulfill its primary obligation to correct known or obvious defects which, if left uncorrected, might endanger the safety of the longshoremen. This case presents the problem once again. Because other circuits have adopted differing approaches, and because the cases in our own Circuit reflect some disagreement on this issue, we feel that a thorough discussion of the problem is warranted.

*The Statutory Purpose*

The events leading up to the enactment of the 1972 Amendments to the LHWCA have been thoroughly chronicled by both courts and commentators,[4] and need not be reviewed here. For present purposes, it is sufficient to state that Congress extinguished vessel liability predicated upon the negligence of the stevedore or upon the "unseaworthiness" of the ship. 33 U.S.C. § 905(b) (1976). The longshoreman's third-party action against the vessel, while preserved by the Amendments, was limited to injuries "caused by the negligence of a vessel." *Id.* The contours of the shipowner's liability for negligence are not explained in the statute, and the legislative history, while providing some general guidance, seems to embrace many of the same conflicting principles that have troubled the courts. Nevertheless, certain conclusions may be drawn from the statute and its history.

First, Congress was concerned about safety in the longshoring industry. At the time of the 1972 Amendments, longshoring was the nation's second most dangerous industry (behind only coal mining), and the Senate Committee sought to apply "every appropriate means . . . toward improving the tragic and intolerable conditions which take such a heavy toll upon workers' lives and bodies in this industry." S.Rep.No.92–1125, 92d Cong., 2d Sess. 2 (1972). The House Report states that permitting actions against the vessel based on negligence "will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work." H.R.Rep.No.92–1441, 92d Cong., 1st Sess. 6,

2. Evans testified that "boards were all over the hatch" and that the floor "was all torn up completely." In addition, he claimed that the floor was covered with "a lot of grease and things like that." The shipowner contended that the grease had been laid down by the stevedore to facilitate sliding the cargo across the floor.

3. The meaning of this cryptic command was hotly contested at trial and, not surprisingly, testimony as to its meaning was conflicting. Mills testified that he did not know whether any plywood was, in fact, brought back to the hatch and that he left the hatch after Evans arrived. Evans, on the other hand, testified that Mills accompanied him in a search for dunnage, that Mills was present during the holdman's complaints, and that Mills and the ship's mate ordered Evans to continue without the dunnage. From the testimony, the jury could have found that the facts were as Evans related them.

4. *See, e. g., Munoz v. Flota Merchante Grancolombiana,* 553 F.2d 837 (2d Cir. 1977); *Napoli v. Hellenic Lines, Ltd.,* 536 F.2d 505 (2d Cir. 1976); *Landon v. Lief Hoegh and Co.,* 521 F.2d 756 (2d Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976); Robertson, *Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* 7 J.Mar.L. & Com. 447 (1976); Note, *The Injured Longshoreman vs. the Shipowner After 1972: Business Invitees, Land-Based Standards, and Assumption of Risk,* 28 Hastings L.J. 771 (1977).

*reprinted in* [1972] U.S.Code Cong. & Ad. News, pp. 4698, 4704 (hereinafter cited as House Report). The Committee emphasized that "nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition." *Id.*

Second, Congress sought to eliminate longshoremen's actions against the shipowner based on the unseaworthiness of the vessel or the negligence of the stevedore, replacing those remedies with a standard of care derived from land-based principles of negligence:

> The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as "unseaworthiness", "nondelegable duty", or the like.

> Persons to whom compensation is payable under the Act ... cannot bring a damage action under the judicially-enacted doctrine of unseaworthiness. Thus a vessel shall not be liable in damages for acts or omissions of stevedores or employees of stevedores subject to this Act.

*Id.* at 4703. As Judge Friendly has pointed out, any interpretation of the Act which imposes upon the vessel liability without fault will place the shipowners in a worse position than before, since the vessel's indemnity action against the stevedore was also eliminated by the 1972 Amendments. *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682, 687 (2d Cir.) (Friendly, J., dissenting), *cert. denied*, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978).

Third, while directing courts to use a land-based standard of negligence, Congress specifically incorporated the admiralty concept of comparative negligence in place of the traditional terrene doctrines of contributory negligence and assumption of the risk:

> [T]he Committee intends that the admiralty concept of comparative negligence, rather than the common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of "assumption of risk" in an action by an injured employee shall also be applicable.

House Report at 4705.

Finally, Congress made clear that the stevedore is to have the primary responsibility for the safety of the longshoremen. Section 941 requires the stevedore to "furnish and maintain employment and places of employment which shall be reasonably safe for his employees" and to comply with the regulations promulgated under the Act. 33 U.S.C. § 941(a) (1976). *See Canizzo v. Farrell Lines, Inc., supra*, 579 F.2d at 688 (Friendly, J., dissenting); *Cox v. Flota Mercante Grancolombiana*, 577 F.2d 798, 802–03 (2d Cir.), *cert. denied*, 439 U.S. 881, 99 S.Ct. 222, 58 L.Ed.2d 195 (1978); *Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1248–49 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). *See also* Hazen & Toriello, *Longshoremen's Personal Injury Actions Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act*, 53 St. John's L.Rev. 1, 9 (1978); Comment, *Developing a Consistent Theory of Vessel Liability to Injured Longshoremen Under the LHWCA*, 45 Brooklyn L.Rev. 731, 749–55 (1979). Since the stevedore is an independent contractor in control of the cargo operation and is hired specifically for his expertise, the stevedore is ordinarily in the best position to prevent accidents which might arise in the course of loading or unloading the ship.

### The Judicial Response

Faced with the task of interpreting these various policies "uniformly,"[5] this Court

---

5. The legislative history makes clear that Congress intended a uniform negligence standard to apply:

[T]he Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports de-

adopted Restatement (Second) of Torts § 343A as the standard for vessel liability under the LHWCA.[6] *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505, 509 (2d Cir. 1976); *Lubrano v. Royal Netherlands Steamship Co.*, 572 F.2d 364, 366 (2d Cir. 1978). The Fifth Circuit soon followed. *See Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233, 1238 (5th Cir. 1977). The use of § 343A, however, has come under increasing criticism from the other circuits. *See Hurst v. Triad Shipping Co.*, *supra*, 554 F.2d at 1249 n.35 (finding § 343A imposes an unduly burdensome duty on the ship to supervise stevedore); *Sarauw v. Oceanic Navigation Corp.*, 622 F.2d 1168, 1174 (3d Cir. 1980) (dictum) (finding § 343A, as applied, too burdensome to longshoremen); *Johnson v. A/S Ivarans Rederi*, 613 F.2d 334, 347–48 (1st Cir. 1980) (rejecting all Restatement formulations in favor of a "reasonableness" test); *Santos v. Scindia Steam Navigation*, 598 F.2d 480, 485–86 (9th Cir. 1979), *cert. granted*, 446 U.S. 934, 100 S.Ct. 2150, 64 L.Ed.2d 786 (1980) (same). Moreover, several judges of this Circuit have openly questioned the appropriateness of § 343A in the context of the LHWCA. *See Lubrano v. Royal Netherlands Steamship, supra*, 572 F.2d at 372 (Moore, J., dissenting) ("the special characteristics of the LHWCA preclude unthinking adherence to § 343A alone"); *Canizzo v. Farrell Lines, Inc., su-*pra, 579 F.2d at 688 (Friendly, J., dissenting) (mistake to accord "talismanic significance" to § 343A in light of congressional policies). Further, other decisions of this Court, while not specifically rejecting § 343A, have pursued a different analytical route in reaching their results. *See, e. g., Cox v. Flota Mercante Grancolombiana, supra*, 577 F.2d at 801–05; *Hickman v. Jugoslavenska Linijska Plovidba Rijeka, Zvir*, 570 F.2d 449, 451–52 (2d Cir. 1978) (per curiam). Recognizing that district courts can "scarcely be expected to function with so discordant a chorus on this court," *Canizzo v. Farrell Lines, Inc., supra*, 579 F.2d at 690 (Friendly, J., dissenting), and acknowledging that the "uniform" interpretation sought by Congress has hardly been achieved,[7] we feel it is appropriate to canvass the various judicial approaches to this problem and to explain why we remain convinced that the application of § 343A set forth in *Giglio v. Farrell Lines, Inc.*, 613 F.2d 429, 431–35 (2d Cir. 1980), represents the best approach for determining vessel liability under § 905(b) of the Act.

*The Standard of Shipowner Liability*

In large part, the inconsistency in the interpretation of § 905(b) stems from disagreement about the legal effect of the stevedore's status as an independent contractor. One approach, relying primarily on Restatement (Second) § 409,[8] focuses on the

pending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law.

House Report, *supra*, at 4705. *See Cox v. Flota Mercante Grancolombiana, supra*, 577 F.2d at 800 n.1. As one commentator has noted, "[t]here is at least superficial incongruity in calling for both land-based law and federal uniformity, as the traditional source of a federally uniform body of law in these matters has been the general maritime law." Robertson, *supra*, at 466 (1976). Under these circumstances, it was natural for federal courts to gravitate to the standards set forth in the Restatement.

**6.** Restatement (Second) of Torts § 343A(1) provides:

A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

**7.** *See* note 5, *supra*.

**8.** Restatement (Second) of Torts § 409 provides:

Except as stated in §§ 410-429 the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants. Although Prosser has stated that the "very number" of exceptions contained in §§ 410–429 "is sufficient to cast doubt upon the validity of the rule," Prosser, Law of Torts § 71 at 468 (4th ed. 1971), the cases applying § 409 to the LHWCA have generally held the exceptions inapplicable. *See Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1249–50 (3d Cir.), *cert. denied*,

stevedoring process and the stevedore's control; the other, relying primarily on § 343A, focuses on the condition of the ship and the foreseeability of harm resulting from known or obvious dangerous conditions. Under a strict application of the "control test," once the shipowner has relinquished control of the vessel, then in a reasonably safe condition, the vessel will not be liable for injuries arising in the course of stevedoring, even if the ship knew of the hazard and could anticipate under the circumstances that the stevedore would not correct the defect. *See, e. g., Cox v. Flota Mercante Grancolombiana, supra,* 577 F.2d at 802–04; *Rich v. United States Lines, Inc.,* 596 F.2d 541, 547–49 (3d Cir. 1979). However, if the ship significantly involves itself in the cargo operation, or otherwise assumes control of the stevedoring, then the insulation afforded by § 409 is lost and the ship will be liable for resulting injuries. *See* Restatement (Second) § 414; *Rich v. United States Lines, Inc., supra,* 596 F.2d at 549–50 (dictum); *Hurst v. Triad Shipping, supra,* 554 F.2d at 1251–52 (dictum) (control must be more pervasive than mere power to start and stop work). *See also Lubrano v. Royal Netherlands Steamship Co., supra,* 572 F.2d at 373 & n.14 (Moore, J., dissenting). The anticipation test, on the other hand, absolves the ship of liability for injury resulting from known or obvious dangers, whether pre-existing or arising during stevedoring, unless the ship should anticipate under

the circumstances that the longshoreman will be unable to avoid the hazard despite its obviousness. *See Napoli v. Hellenic Lines, Ltd., supra,* 536 F.2d at 508–09; *Lubrano v. Royal Netherlands Steamship Co., supra,* 572 F.2d at 366–67; *Giglio v. Farrell Lines, Inc., supra,* 613 F.2d at 431–32.

There are two problems with the control test. First, it is unclear under that test what standard is used to evaluate dangerous conditions existing on the ship *before* the stevedore begins work. Inasmuch as the control test is premised on the superior ability of the stevedore to control its own negligence, it is inconsistent to apply that test to conditions which the stevedore did not create and over which it had appreciably less control than the ship. But to the extent that the control test sets up two standards of care—one for pre-existing defects and one for defects "arising during" stevedoring—the test will be extremely difficult to apply.[9] Many longshoring accidents are caused by a combination of pre-existing conditions and sloppy stevedoring procedures. For example, a loss of footing may be "caused" by pre-existing slippery cargo or by the failure of the stevedore to provide dunnage. *See Giglio v. Farrell Lines, Inc., supra,* 613 F.2d at 433; *Lubrano v. Royal Netherlands Steamship, supra,* 572 F.2d at 365–66. Indeed, to take the argument a step further, the failure of the

434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977) (§§ 416–429 inapplicable to LHWCA because those sections impose vicarious liability, contrary to the intent of Congress); *Riddle v. Exxon Transp. Co.,* 563 F.2d 1103, 1113 (4th Cir. 1977) (same); *Chavis v. Finnlines Ltd.,* 576 F.2d 1072, 1081 (4th Cir. 1978) (holding §§ 411, 413, 416, 423 and 427 inapplicable); *Hess v. Upper Mississippi Towing Corp.,* 559 F.2d 1030 (5th Cir. 1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978) (same).

**9.** Various types of two-level tests have been proposed. In *Rich v. United States Lines, Inc.,* 596 F.2d 541, 560, 565–66 (3d Cir. 1979), Judge Garth suggested in a concurring opinion that § 409 should apply to the stevedore's activities and that §§ 343 and 343A should apply to dangerous conditions aboard the ship. In *Gallardo v. Westfal-Larsen & Co.,* 435 F.Supp. 484, 490 (N.D.Cal.1977), the court held that *before* commencement of stevedoring activities, the

shipowner must take "reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual or constructive knowledge," but that after stevedoring had begun, the shipowner need correct only those dangerous conditions of which it has actual knowledge. *Accord, Espinoza v. United States Lines, Inc.,* 444 F.Supp. 405, 412–13 (S.D.N.Y.), *aff'd,* 586 F.2d 832 (2d Cir. 1978). *See also* Note, *The Injured Longshoreman After 1972: Business Invitees, Land-Based Standards, and Assumption of Risk,* 28 Hastings L.J. 771, 790–92 (1977). The Ninth Circuit subsequently followed much of the reasoning of *Gallardo,* but implicitly rejected *Gallardo's* dual standard, adopting instead a general reasonableness test. *Santos v. Scindia Steam Navigation Co., supra,* 598 F.2d at 485–89. *Accord, Johnson v. A/S Ivarans Rederi,* 613 F.2d 334, 347–48 (1st Cir. 1980).

stevedore to stop work in the face of an obvious pre-existing hazard can be considered the cause of the longshoreman's subsequent injury. *See Cox v. Flota Mercante Grancolombiana, supra,* 577 F.2d at 802; *Lubrano v. Royal Netherlands Steamship Co., supra,* 572 F.2d at 373 (Moore, J., dissenting). *Cf. Santos v. Scindia Steam Navigation Co., supra,* 598 F.2d at 480, 489 (whether "proximate cause" of injury was defect in ship's crane or sloppy procedures of stevedore). A two-level test based on whether the defect is "pre-existing" would therefore be unhelpful as a guide for vessel conduct, since the determination of liability would depend on the subsequent characterization of the defect.

The second problem is that a strict application of the control test virtually precludes a finding of shipowner negligence, except for cases involving known, concealed defects or active negligence by the ship's personnel. *See Giglio v. Farrell Lines, Inc., supra,* 613 F.2d at 437 (Oakes, J., dissenting). As the court stated in *Gallardo v. Westfal-Larsen & Co.,* 435 F.Supp. 484, 495 (N.D.Cal.1977), "[A]nalysis based upon retention or relinquishment of control poses a potential for abuse by courts which view the commencement of cargo operations as extinguishing the liability of vessels for injuries subsequently sustained by longshoremen." Thus, the control test nearly eliminates as a matter of law the possibility that the vessel could be concurrently negligent in the injury of a longshoreman engaged in cargo operations. *See Rich v. United States Lines, Inc., supra,* 596 F.2d at 565 (Garth, J., concurring) (the control test of § 409 goes "impermissibly far" toward complete abrogation of vessel owner's duty of care). Indeed, application of this standard led one court to conclude that a vessel which had been found negligent could not be held liable because its negligence was not "actionable" under the LHWCA. *Anuszewski v. Dynamic Mariners Corp.,* 391 F.Supp. 1143, 1145 (D.Md.1975), *aff'd,* 540 F.2d 757 (4th Cir. 1976), *cert. denied,* 429 U.S. 1098, 540 F.2d 757, 51 L.Ed.2d 545 (1977). Such an interpretation is plainly inconsistent with Congress' intention to hold the vessel liable for its own negligence:

Although § 905(b) may be construed to "demonstrate that . . . the major responsibility for the proper and safe conduct of the work was to be borne by the stevedore," . . . or that "the primary duty to provide a safe place to work is on the stevedore," . . . neither "major responsibility" nor "primary duty" may be read as "sole responsibility."

*Lopez v. A/S D/S Svendborg,* 581 F.2d 319, 327 (2d Cir. 1978) (citations omitted). Congress apparently felt that preservation of the third-party negligence action against the shipowner would lead to increased safety in the industry, and we must respect that judgment. *See Rich v. United States Lines, Inc., supra,* 596 F.2d at 561–65 (Garth, J., concurring). To interpret the Act solely according to the relinquishment-of-control test would effectively negate the incentive that Congress sought to provide. *Cf. Landon v. Lief Hoegh and Co.,* 521 F.2d 756, 763 (2d Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976) (refusing to limit recovery under § 905(b) to cases where vessel negligence is the sole cause of injury).

■ We continue to adhere to the view that § 343A is the most appropriate standard for determining negligence under § 905(b): a vessel is not liable for injuries resulting from known or obvious dangers unless the shipowner should anticipate the harm despite the obviousness of the danger. Certain lines are easily drawn. First, a shipowner will not be liable where it has neither actual nor constructive notice of a defect; to hold otherwise would impose liability without fault and would be tantamount to a return to seaworthiness. *See* 33 U.S.C. § 905(b); House Report, *supra,* at 4703. Second, the ship must take reasonable remedial steps to protect longshoremen from concealed or nonobvious defects, where the shipowner knows or should know of the condition and should realize that it poses an unreasonable risk of harm. Restatement (Second) of Torts § 343. Third, neither the "anticipation" nor the "control" test imposes on the shipowner an affirma-

tive duty to supervise or oversee the procedures of the stevedore; to so require would "saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905(b)." *Hurst v. Triad Shipping Co., supra*, 554 F.2d at 1249 n.35. *See Giglio v. Farrell Lines, Inc., supra*, 613 F.2d at 433; *Munoz v. Flota Merchante Grancolombiana*, 553 F.2d 837, 840–41 (2d Cir. 1977) ("[C]ommercial reality and applicable union regulations preclude a rule that would require a non-expert [shipowner] constantly to intrude on the work of a master stevedore in the deepest recesses of the ship."); *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233, 1239 (5th Cir. 1977) (no duty to check carbon monoxide level in hold where stevedore was operating forklift). *See also* Robertson, *Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act*, 7 J.Mar.L. & Com. 447, 472–73 (1976); Hazen & Toriello, *supra*, at 19–20; Comment, *supra*, at 760 n.167.

Line drawing becomes considerably more difficult in those cases where the shipowner has notice of a dangerous condition, whether existing before or arising during cargo operations. *See Canizzo v. Farrell Lines, Inc., supra*, 579 F.2d at 685. Mere knowledge of a dangerous condition, however, will not serve as an independent basis for liability. *See Giglio v. Farrell Lines, Inc., supra*, 613 F.2d at 432; *Riddle v. Exxon Transportation Co.*, 563 F.2d 1103, 1111–12 (4th Cir. 1977); *Brown v. Mitsubishi Shintaku Ginko*, 550 F.2d 331, 333–34 (5th Cir. 1977). Rather, the "*sine qua non* of a ship's liability for an obviously dangerous condition arising during the process of loading or unloading is reasonable anticipation that the longshoremen will not be able to avoid it." *Giglio v. Farrell Lines, Inc., supra*, 613 F.2d at 432–33. *See Napoli v. Hellenic Lines, Ltd., supra*, 536 F.2d at 509. In determining whether a shipowner should anticipate injury to longshoremen resulting from a known dangerous condition, courts must take into consideration the independent-contractor status of the stevedore. *See Giglio v. Farrell Lines, Inc., supra*, 613 F.2d at 435; *Canizzo v. Farrell Lines, Inc., supra*, 579 F.2d at 688 (Friendly, J., dissenting); *Lubrano v. Royal Netherlands Steamship Co., supra*, 572 F.2d at 372 (Moore, J., dissenting). *See also* Comment, *supra*, at 749, 751–52; Robertson, *supra*, at 451. The stevedore is specifically hired for its expertise in coping with the dangers inherent in loading and unloading cargo, and in many cases it will be perfectly reasonable for the shipowner to assume that the stevedore will correct the defect. *See Giglio v. Farrell Lines, Inc., supra*, 613 F.2d at 433; *Canizzo v. Farrell Lines, Inc., supra*, 579 F.2d at 689 (Friendly, J., dissenting) ("No decision of this court requires us to ignore the ship's justifiable reliance on the independent contractors to perform their duty."); *Frasca v. Prudential-Grace Lines, Inc.*, 394 F.Supp. 1092, 1101 (D.Md.1975) (jury question as to whether shipowner could reasonably assume that the stevedore would correct slippery conditions). *See also* Comment, *supra*, at 762 & n.172. Ordinarily, a ship should be entitled to rely on its stevedore to perform its job in a safe and workmanlike fashion. But we cannot hold that whenever control is relinquished to the stevedore, the shipowner may, as a matter of law, "rely" on the stevedore. This point of view is the functional equivalent of the control test and suffers from the defects outlined above. Rather, there may be circumstances in which it would not be reasonable for the shipowner to assume that the stevedore will correct the problem. Thus, for example, where the dangerous condition would be too difficult for the stevedore alone to remedy, or where the custom in the industry places the burden of acting on the shipowner, or where the ship affirmatively joins in the decision to continue despite the hazard, it would not be realistic to say that the shipowner's reliance on the stevedore is justified. The goal, in short, is for the trier of fact to reach a realistic conclusion concern-

ing the shipowner's reasonable anticipation.[10]

## The District Court's Charge

The plaintiff's theory of liability below was based on *Lubrano v. Royal Netherlands Steamship Co., supra*, 572 F.2d at 367, in which we held that if there was evidence that the shipowner had "joined in" the stevedore's decision to proceed without the necessary dunnage, then there was a jury question as to whether the shipowner might have anticipated the harm. From the facts developed at trial the jury could have found that the ship, through its port captain and mate, "joined in" the stevedore's decision to proceed notwithstanding the hazard. But on the basis of the charge given, the jury could have found the shipowner liable without a finding of "joining in" or any other form of shipowner anticipation. Because we feel that such a finding of liability extends beyond the intention of the 1972 Amendments to the Act and the cases interpreting those provisions, we must remand for a new trial.

■ The charge in this case was marred by three separate errors, any one of which would be grounds for reversal. First, the court charged that the ship had a continuing, nondelegable duty to furnish the longshoremen a safe place to work.[11] This

---

10. Several cases have held that the standard set forth in § 343A is tantamount to assumption of the risk and contributory negligence, doctrines specifically rejected by the legislative history of the LHWCA. *See Santos v. Scindia Steam Navigation Co., supra*, 598 F.2d at 486–87; *Johnson v. A/S Ivarans Rederi, supra*, 613 F.2d at 346; *Gallardo v. Westfal-Larsen & Co., supra*, 435 F.Supp. at 493–94. As these courts point out, the drafters of the Restatement clearly indicated that assumption of risk and contributory negligence "have a direct bearing upon liability under Sections 343 and 343A." *Id.* at 494. For example, comment e to § 343A states, "The possessor of the land may reasonably assume that [the invitee] will protect himself by the exercise of ordinary care, or that he will voluntarily assume the risk of harm if he does not succeed in doing so." *See also* comment d to § 343A, comments b & d to § 343, and comment d to § 496C.

We do not believe that § 343A, as applied to the LHWCA by decisions of this Circuit, entails the doctrines of assumption of risk or contributory negligence. Indeed, in *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505, 508 (2d Cir. 1976), we adopted § 343A (over § 343) because "the traditional rule [of § 343], while generally phrased in terms of negligence, is really a commingling of the doctrines of negligence, contributory negligence and assumption of risk. Where, as in this case, the doctrine of comparative negligence is observed and assumption of risk is not a defense, the arguments in support of the rule lose much of their cogency." Further, given the complexity of the commercial relationships involved in the stevedoring context, it is unrealistic to state that the relevant factors under § 343A, including shipowner reliance on the stevedore, are the equivalent of "defenses" to the third-party action. Rather, these factors define whether the ship was negligent in the first place. *See Giglio v. Farrell Lines, Inc., supra*, 613 F.2d at 435; *Clemons v. Mitsui*

*O.S.K. Lines, Ltd.*, 596 F.2d 746, 750 n.17 (7th Cir. 1979) (per curiam). Section 343A merely functions as a standard for determining liability, not as an absolute bar against recovery.

11. The relevant portion of the court's charge reads as follows:

It's the ship owner's duty to furnish the longshoremen, furnish them with a reasonably safe place to work. That duty includes the duty to remedy conditions dangerous to the longshoremen that the ship owner knows about or which have existed long enough that in the exercise of reasonable care the ship owner should have learned about an[d] dealt with them.

It was the continuing duty of the defendant vessel owner at the time and place of the accident in question to use reasonable care to furnish the plaintiff with a reasonably safe place to work and reasonably safe equipment aboard the ship and to use reasonable care under the circumstances to maintain and keep the places of work and the ship's equipment in a reasonable and safe condition. The continuing duty to use reasonable care under the circumstances owed by the shipowner to the longshoremen while aboard the ship existed at the time independently of them. Separate from any duty owed to the longshoremen by others including the stevedoring company as their employer. It cannot be transferred by the ship owner to anyone. Thus even if the ship's stevedore was negligent in failing to eliminate the dangerous condition that would not in and of itself be a defense for the ship owner if the ship owner was negligent. The ship owner may not relieve itself of the liability due to the longshoremen due to a danger caused by his own negligence by contractual agreement or otherwise for the stevedore cargo removal operation.

Court recently questioned the appropriateness of using such a charge, and cautioned that when the "safe place to work" charge is given, the jurors should be "instructed as to the legal parameters of the duty owed" and be told that the doctrine "does not make the shipowner responsible for the equipment and work methods of the independent stevedore or the stevedore's negligent acts occurring as a detail of the work." [12] *Lubrano v. Royal Netherlands Steamship Co.*, 622 F.2d 29, 32 (2d Cir. 1980) (remanding for new trial). The jury could easily have concluded from the "safe place to work" charge that, since the floor was in disrepair, the ship should be liable. [13] That is not the law of this Circuit. Rather, where known and obvious dangers are involved, a shipowner is liable to the employees of the stevedore only where the harm should have been anticipated despite the obviousness of the danger. Since anticipation is a jury question, *Napoli v. Hellenic Lines, Ltd., supra*, 536 F.2d at 509, we must remand for a determination of this issue. *See Lubrano v. Royal Netherlands Steamship Co., supra*, 572 F.2d at 367 (whether ship, by "joining in" decision to proceed, anticipated harm is jury question).

Second, the district court charged that the shipowner must use reasonable care "to provide for precaution[s] where the work should be recognized as likely creating a particularly unreasonable risk of physical harm for the longshoremen unless precautions are taken." [14] This instruction is based on § 413 of the Restatement (Second) of Torts, which provides:

One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to

---

The ship's owner is never relieved of its continuing duty to exercise reasonable care. If the defendant through any of its personnel, after being notified of an open and obvious danger and improper flooring, kept the longshoremen working or [joined] in the stevedore's decision to do so, then you may find the defendant liable.

**12.** We note that a virtually identical charge which had appeared in Devitt & Blackmar, 3 Federal Jury Practice and Instructions § 96.35 (3d ed. 1977), was subsequently withdrawn by the 1980 supplement, with the editors stating, "The authors agree with experienced admiralty practitioners who have suggested that the text instruction is misleading, and very probably legally erroneous, in light of the 1972 amendments to the [LHWCA]."

**13.** The jury might well have discredited Evans' testimony concerning the ship's "joining in," since that testimony was often inconsistent and in one important respect conflicted with that of Mills. Instead, the jury might have found from the conflicting evidence that the decision to proceed was Pittston's, and that the ship did not in any appreciable way "join in" that decision. Indeed, there was ample evidence from which the jury could have concluded that the shipowner did not anticipate any harm, since it could have reasonably assumed that Pittston would correct the problem in the floor, just as it had done on the previous day.

**14.** This segment of the charge reads as follows:

The defendant ship owner as the employer of an independent contractor, the stevedoring company[,] is required to use reasonable care to provide for precaution where the work should be recognized as likely creating a particularly unreasonable risk of physical harm for the longshoremen unless precautions are taken. Even the ship owner, or employer[,] at the time he made the contract with the stevedore had no reason to anticipate that the conditions which would arise, which would require such precaution by taking in the fact that such conditions do arise and the defendant ship owner knows or should have known it is then required to exercise reasonable care to provide some manner for the taking of special precautions.

A special risk refers to those risks which are particular to the work to be done and arise out of the character and out of the place where it is to be done which a reasonable ship owner would recognize the necessity of taking special precautions. The situation is one in which a risk may be created which is not a normal routine act of human activity which is such as driving an automobile but rather than that, special damages to those in the vicinity arising out of a particular situation created and calling for special precautions. If a ship owner's negligence has set a dangerous force in motion, it is not safe in liability from harm if it caused an innocent person such as the plaintiff to be injured solely because another like the stevedoring company had negligently failed to take action that would have avoided this.

them by the absence of such precautions if the employer

    (a) fails to provide in the contract that the contractor shall take such precautions, or

    (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.

The district court apparently relied on *Lopez v. A/S D/S Svendborg*, 581 F.2d 319, 324 (2d Cir. 1978), in making this charge. We do not read *Lopez* as establishing § 413 as a separate basis for liability under § 905(b) of the Act. Rather, the *Lopez* court was attempting to substantiate its contention that a ship should not be allowed to escape liability under § 343A by "hiding behind" the stevedore's primary duty of care to the longshoremen. Reliance on § 413 as an independent basis of liability would be mistaken for a number of reasons. In the first place, it is questionable, at least in the stevedoring context, whether the "others" to whom § 413 applies include the employees of the independent contractor. *See Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030, 1033–34 (5th Cir. 1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978) (refusing to apply § 413 to an independent contractor's employee suing under § 905(b) of the LHWCA); *Chavis v. Finnlines, Ltd.*, 576 F.2d 1072, 1080–81 (4th Cir. 1978); Comment, *supra*, at 747

n.100; Hazen & Toriello, *supra*, at 30 n.111. In addition, § 413, by its own terms, applies only when the employer "fails to provide in the contract that the contractor shall take such precautions." Here, the stevedore's warranty of workmanlike performance running in favor of the shipowner is an implied covenant of every shipowner-stevedore contract, and provides the necessary precaution.[15] Finally, § 413 simply does not fit into the stevedoring context. The stevedore is hired precisely for his expertise in a specialized and often dangerous trade. Both the statute, 33 U.S.C. § 941(a) (1976), and regulations, 29 C.F.R. §§ 1918.1–.106 (1979), place the primary responsibility for safety on the stevedore and it is clear from the legislative history of the 1972 Amendments that Congress intended to place the principal burden of safety on stevedores. *See* S.Rep.No.92–1125, 92d Cong., 2d Sess. 2 (1972). *See also Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 860 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Lucas v. "Brinknes" Schiffahrts Ges.*, 379 F.Supp. 759, 768 (E.D. Pa.1974). Given the special relationship among stevedore, longshoreman and shipowner, it would be inappropriate to impose liability upon the shipowner for its failure to take "special precautions" to ensure the safety of the longshoremen.[16]

15. Although the 1972 Amendments to the LHWCA eliminated the shipowner's right to indemnity from the stevedore for breach of its warranty of workmanlike service, it is clear, despite contrary dicta in *Lopez v. A/S D/S Svendborg, supra*, 581 F.2d at 328–29, that the warranty itself has survived. *See Fairmont Shipping Corp. v. Chevron Int'l Oil Co.*, 511 F.2d 1252 (2d Cir. 1975).

16. The plaintiff contends that because the shipowner failed properly to object either to the § 413 charge or to the charge that the ship had a continuing, nondelegable duty, these points have not been preserved for appeal. We disagree. Fed.R.Civ.P. 51 states in pertinent part: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." "The Rule does not require formality and it is not important in which form an objection is made ... as long as it is clear that the trial

judge understood the party's position" and was sufficiently alerted to possible errors that he had an opportunity to correct them. 5A Moore's Federal Practice ¶ 51.04 at 51–28, 51–30 to 51–35 (2d ed. 1979). Here, the colloquy between the trial judge and the shipowner's counsel, which took place after the charge was read and before the jury retired, leaves little doubt that the trial judge understood the shipowner to be objecting to the § 413 charge. On the other hand, it is a close question whether the shipowner's generalized objection to the charge's definition of the scope of its duty, taken together with the repeated request for charges spelling out its right to rely upon the stevedore's workmanlike performance, were statements "distinct" enough to apprise the court of the error of its "continuing duty" instruction. In fact, the judge responded by asking whether counsel wished to add "anything in particular," and upon hearing more abstract talk concluded that he was unable to understand the nature of the objection. However,

Finally, we think the district court erred in failing to inform the jury that, for the purpose of determining shipowner anticipation, they could consider the fact that the stevedore is primarily responsible for the safety of the longshoremen and is obligated to take whatever steps are necessary to correct an unsafe condition aboard ship.[17] It is totally unrealistic to assume that a jury can meaningfully assess shipowner anticipation in the stevedoring context without being informed that the stevedore bears the primary responsibility to correct dangerous conditions and that the shipowner will often rely on the stevedore to do so. See Comment, supra, at 749–50 & n.105. And in order that the jury have a concrete idea of what that primary responsibility consists of, the trial court should instruct the jury as to the contents of the relevant Safety and Health Regulations for Longshoring, here 29 C.F.R. §§ 1981.91(a) and (c) (1980).[18] See Giglio v. Farrell Lines, Inc., supra, 613 F.2d at 435 n.7; id. at 436 (Sifton, J., concurring in result); Canizzo v. Farrell Lines, Inc., supra, 579 F.2d at 688 (Friendly, J., dissenting); Cox v. Flota Mercante Grancolombiana, S.A., supra, 577 F.2d at 803. This is not to say that the shipowner can never be found negligent when the stevedore has breached its primary duty to the longshoremen. Other factors, such as the affirmative involvement of the shipowner in the stevedore's decisionmaking and the difficulty of correcting the defect, may militate against a finding of reliance and instead establish that the shipowner should have anticipated that the defect

would remain uncorrected and that harm would result. These are questions which the jury will have to determine on remand.

Evans argues that the elements of the district court's charge should be viewed in context, not in isolation, and that, so viewed, the charge is more than adequate to withstand appellate scrutiny. Certainly perfection is not expected of a charge. Franks v. United States Lines Co., 324 F.2d 126, 127 (2d Cir. 1963). Rather, the question is whether the charge, taken as a whole, is likely to mislead the jury as to the applicable principles of law. Norfleet v. Isthmian Lines, Inc., 355 F.2d 359, 362–63 (2d Cir. 1966) (construing a seaworthiness charge); Oliveras v. United States Lines Co., 318 F.2d 890, 892 (2d Cir. 1963). This Circuit has determined that the standard of vessel liability turns on shipowner anticipation. There can be little doubt that the charge given, taken as a whole, does not convey that notion. See Lubrano v. Royal Netherlands Steamship Co., supra, 622 F.2d at 32. Further, where an erroneous legal statement on a vital issue can serve as an independent basis for a jury finding of negligence, the mistake "is not cured by a prior unexceptionable and unilluminating abstract charge." Bollenbach v. United States, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). See DeLima v. Trinidad Corp., 302 F.2d 585, 587 (2d Cir. 1962) (specific error concerning seaworthiness vitiates entire charge); Franks v. United States Lines, supra, 324 F.2d at 127. Here, the jury was erroneously instructed that

we need not resolve this point, since in any event, the other errors in the court's charge necessitate remanding for a new trial. Under these circumstances and especially in light of the obviousness of the error, we think it appropriate to set down the correct view for the trial courts' future guidance. See Troupe v. Chicago, Duluth & Georgia Bay Transit Co., 234 F.2d 253, 260 (2d Cir. 1956).

17. The defendant requested, and the court denied, the following charge:

In determining whether the shipowner should have anticipated the harm which allegedly occurred and/or acted reasonably to prevent or minimize the extent of the risk you may consider the fact that as a matter of custom and practice in the Port of New York

a shipowner relies on the judgment of the stevedoring company with respect to the safety of the work area since the stevedoring company, plaintiff's employer, is primarily responsible for the safety of his longshoremen/employees, and is obliged by Federal Statute to correct any unsafe condition aboard ship.

18. 29 C.F.R. § 1918.91 (1980) provides:

(a) Weather deck walking and working areas shall be kept reasonably clear of lines, bundles, dunnage and all other loose tripping or stumbling hazards . . . .

(c) Slippery conditions shall be eliminated as they occur.

§ 413 could serve as an independent basis of liability and that mere notice on the part of the shipowner of a dangerous condition could justify a finding that the ship breached its "continuing duty" to provide a safe place to work. Under these circumstances, we cannot say that the errors in the charge were harmless.

*The Shipowner's Rights Against Pittston*

At trial, the shipowner unsuccessfully moved to dismiss that part of Evans' claim which represented compensation already paid to Evans by Pittston's insurer,[19] arguing that Evans was not the real party in interest as to that sum. *See* Fed.R.Civ.P. 17. After judgment the shipowner moved, again unsuccessfully, to modify the judgment "to reduce its amount by the sum of total compensation benefits previously received by plaintiff . . . ." The shipowner assigns as error the denial of these motions.

To understand the reason for these motions one need only examine the result of this litigation: the plaintiff Evans will recover little, if any, of his $80,000 judgment. First, the lawyer's fee, almost always contingent, must be deducted, a fee which is computed on the basis of the entire judgment and which the stevedore is not required to share.[20] The balance of the judgment will be consumed by Pittston's insurer, who is entitled by virtue of a judicially created "lien" on the proceeds of a third-party negligence action, to recover the $60,-484.86 it paid to Evans as compensation.[21] Thus, the stevedore gets off "scot-free"[22] even though it may have been concurrently negligent, the longshoreman has nothing to show for his trouble, and the shipowner must bear the entire cost of the judgment, even though its negligence may have been only a minor factor in causing the injury. The shipowner may not seek contribution from a concurrently negligent stevedore, *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.*, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), nor may it withhold from the judgment the amount of the lien, since such a deduction would be the "substantial equivalent of contribution." *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 412, 74 S.Ct. 202, 206, 98 L.Ed. 143 (1953). Such a system, the shipowner argues, places little incentive on the stevedore to promote safety and discourages settlement of longshoremen's claims—both of which were important congressional aims in enacting the 1972 Amendments.

To avoid this anomalous result, the shipowner draws on the lengthy legislative and judicial history of the LHWCA to demonstrate that there is, in fact, no longer a stevedore's "lien" on the proceeds of a third-party suit. Instead, the shipowner argues, the stevedore has a direct cause of action for the amount of its compensation.[23]

19. Pittston's insurer, Home Insurance Company, was subrogated to Pittston's lien rights under 33 U.S.C. § 933(h) (1976). Hereafter, references to Pittston include its insurer, where applicable.

20. *See Bloomer v. Liberty Mutual Ins. Co.*, 445 U.S. 74, 100 S.Ct. 925, 63 L.Ed.2d 215 (1980). In *Bloomer*, the longshoreman sought to compel the stevedore's insurer to share the costs of the third-party action, arguing that "since the recovery from the shipowner would benefit [the stevedore], equity required that [the stevedore] bear a portion of the expenses of obtaining that recovery." *Id.* at 76, 100 S.Ct. at 927. The Court rejected the argument, relying on the "language, structure, and history" of the LHWCA. *Id.* at 77, 100 S.Ct. at 927.

21. *See The Etna*, 138 F.2d 37 (3d Cir. 1943). In *The Etna*, a longshoreman argued that an amendment to the LHWCA, which provided for assignment of the third-party cause of action

only after acceptance of a formal compensation award, indicated that where compensation was accepted *without* a formal award (*e. g.*, in settlement), the longshoreman was entitled to a double recovery. The court disagreed, holding that the stevedore has a lien on the longshoreman's third-party recovery to the extent of compensation benefits.

22. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 274, 99 S.Ct. 2753, 2763, 61 L.Ed.2d 521 (1979) (Blackmun, J., dissenting).

23. The argument begins with the 1927 version of the LHWCA and wends its way through 53 years of cases and statutory amendments. The focus of the argument is that 33 U.S.C. § 933(b), which provides for an assignment of the longshoreman's cause of action after a compensation "award," was not intended to "cut off" the stevedore's right to bring a direct action for the amount of its compensation lia-

Since the stevedore can sue in its own capacity to recover compensation expenditures, it has a remedy at law and is not entitled to an equitable lien. Accordingly, the stevedore is the real party in interest as to the amount of the lien and is subject to ordinary defenses, such as contributory negligence. *See Celanese Corp. of America v. John Clark Industries*, 214 F.2d 551, 556 (5th Cir. 1954). Thus, the argument goes, the stevedore may no longer wait in the background of the litigation and quietly collect its compensation payments "off the top" of the longshoreman's recovery. The shipowner emphasizes that such a direct action system would not reduce the longshoreman's net recovery, since under the present system, the amount representing compensation payments must in any event be paid over to the stevedore.

The shipowner forthrightly acknowledges that its proposal would be barred by *Halcyon* and *Pope & Talbot*, but argues that those cases have been overruled by *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969), in which the Supreme Court allowed a stevedore to bring a direct action (by way of counterclaim) against a ship for the amount of compensation liability.[24] In addition, the shipowner concedes that the substance of this argument was rejected by this Court in *Landon v. Lief Hoegh and Co.*, *supra*, but insists that *Landon* was wrongly decided. We disagree. As Judge Gurfein pointed out in *Landon*, the stevedore's claim in *Burnside* was founded "not on the shipowner's wrong to the *longshoreman*, but on its 'independent wrong' to the *stevedore* in

failing to provide a safe place to work which had caused the *stevedore* damage." *Id.* at 760 (emphasis in original). In *Burnside*, the Illinois wrongful death statute limited recovery to $30,000, while the stevedore's potential compensation liability was $70,000. In these "rather unusual circumstances" of a shortfall, the stevedore was permitted to resort to a common law claim for the excess "not on the theory of concurrent negligence to the plaintiff, but on the theory of direct negligence by the shipowner alone." *Id.*

Despite the fact that *Halcyon* and *Pope & Talbot* were rendered in days when different substantive doctrines reigned and when the general judicial attitude towards contribution was much more negative than that now prevailing, recent decisions of the Supreme Court do not in any way signal a retreat from those cases. In *Cooper Stevedoring Co. v. Kopke, Inc.*, 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974), the Court allowed a ship to sue a *nonemployer* stevedore for contribution, but emphasized that where, as here, the stevedore is the employer of the plaintiff longshoreman, "our decision in *Halcyon* was, and still is, good law on its facts." *Id.* at 115, 94 S.Ct. at 2179. More recently, in *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), the Court acknowledged that a "judicially created lien in the employer's favor operates where the longshoreman himself sues." *Id.* at 269–70, 99 S.Ct. at 2761 (citing *The Etna*) (footnote omitted). Further, in stressing that the employer-stevedore should not be directly

---

bility. The shipowner claims that *Federal Marine Terminals, Inc. v. Burnside*, 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969), plainly establishes this right to a direct action and overrules prior Supreme Court cases to the contrary. Because we do not read *Burnside* so broadly, *see infra*, we have concluded that we remain bound by the decisions of the Supreme Court and this Circuit and therefore do not reach the statutory argument raised by the shipowner.

**24.** In *Burnside* a longshoreman had fallen to his death while loading the defendant's ship. His widow filed a claim for LHWCA benefits, then brought a third-party wrongful death action

against the shipowner. The shipowner responded by filing a separate action against the stevedore, seeking indemnification for any judgment it might have to pay in the wrongful death action. The stevedore counterclaimed that the shipowner had breached its duty to provide the *stevedore* with a safe place to work. The lower courts dismissed the counterclaim, but the Supreme Court reversed, holding that the shipowner does owe the stevedore certain contractual duties and that statutory subrogation is not the stevedore's exclusive remedy for the vindication of these contractual rights.

or indirectly liable to the vessel for damages recovered by the plaintiff longshoreman, the *Edmonds* Court explicitly relied on *Pope & Talbot* for the proposition that any reduction of the shipowner's liability at the expense of the employer would be forbidden as the "substantial equivalent of contribution." *Id.* at 270 n.28, 99 S.Ct. at 2761.[25] *See also Bloomer v. Liberty Mutual Ins. Co., supra*, 445 U.S. at 80–81, 100 S.Ct. at 928 (review of the LHWCA and its legislative history establishes "that Congress intended the stevedore to recover the full amount of its lien"). In light of these statements, we cannot accept appellant's argument that the lien has disappeared and that *Pope & Talbot* and *Halcyon* have been effectively overruled.

Finally, while we confess dissatisfaction with the results reached in this case and others like it,[26] we must conclude that the solution of the problem, if indeed there is a solution, must come from Congress or the Supreme Court. We recognize that the LHWCA has not been a generally fruitful area for judicial intervention, and we have no reason to believe that the subject matter of appellant's argument, complicated as it is by the "overlap of loss-allocating mechanisms that are guided by somewhat inconsistent principles," *Edmonds, supra*, 443 U.S. at 261, 99 S.Ct. at 2757, would be an exception. *See generally* Steinberg, *The 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act: Negligence Actions By Longshoremen Against Shipowners—A Proposed Solution*, 37 Ohio St.L.J. 767, 788–800 (1976) (urging judicial nonintervention). Thus, even if we were convinced that our decisions and the decisions of the Supreme Court permitted intervention, we have concluded that it would be unwise for us to attempt "to fashion new judicial rules of contribution" in an area so heavily regulated by Congress. *Halcyon, supra*, 342 U.S. at 285, 72 S.Ct. at 279.[27]

Judment reversed and case remanded for a new trial.

FRIENDLY, Circuit Judge, concurring:

While I do not agree with every word in Judge Meskill's opinion with respect to liability, I happily concur because it is a major advance in the endeavor to bring some order out of the chaos surrounding the ship's liability under 33 U.S.C. § 905(b) in cases of concurrent negligence by the stevedore-employer and because I see no prospect that any other panel or even the court *in banc* would achieve a better formulation. I reluctantly agree also that we are compelled by the combination of statute and Supreme Court decisions to sanction a result wherein if a properly charged jury were to find in Evans' favor in the same amount, the less negligent ship would bear the entire load, the more negligent employer would emerge

**25.** Significantly, the *Edmonds* Court cited *Dodge v. Mitsui Shintaku Ginko K.K. Tokyo*, 528 F.2d 669, 673 (9th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976), in which the Ninth Circuit rejected an argument similar to the one advanced by appellant, and Steinberg, *The 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act: Negligence Actions by Longshoremen Against Shipowners—A Proposed Solution*, 37 Ohio St.L.J. 767, 792–93 (1976), in which the author rejects all "equitable credit" schemes in favor of a policy of judicial nonintervention. 443 U.S. at 270 n.28, 99 S.Ct. at 2762 n.28.

**26.** *See Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714, 725–26 & n.8 (2d Cir. 1978).

**27.** *See Bloomer v. Liberty Mutual Ins. Co., supra*, 445 U.S. at 81 & n.6, 100 S.Ct. at 929 & n.6, in which the Court declined to require the stevedore to share the costs of the third-party action where Congress had chosen not to modify the cost allocation system.

The cases overwhelmingly agree with the result reached today. *See Lopez v. A/S D/S Svendborg, supra*, 581 F.2d at 324–26; *Samuels v. Empresa Lineas Maritimas Argentinas*, 573 F.2d 884, 887–89 (5th Cir. 1978), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 878 (1979); *Shellman v. United States Lines, Inc.*, 528 F.2d 675, 680 (9th Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1668, 48 L.Ed.2d 177 (1976); *Dodge v. Mitsui Shintaku Ginko K.K. Tokyo, supra*, 528 F.2d at 671–74; *Santino v. Liberian Distance Transports, Inc.*, 405 F.Supp. 34, 35–36 (W.D.Wash.1975); *Hubbard v. Great Pacific Shipping Co.*, 404 F.Supp. 1242, 1243–44 (D.Or.1975); *Lucas v. "Brinknes" Schiffahrts Ges.*, 379 F.Supp. 759, 763–64 (E.D.Pa. 1974) (three-judge court).

scot-free, and Evans would take nothing, so that the beneficiaries of the recovery would be Evans' lawyer and his employer's compensation insurer. Our judicial system should not be obliged to countenance so palpably unjust a result, and the maritime industry should not be exposed to such costs.

Perhaps one reason why the Supreme Court has not been more sympathetic to proposals to modify its decisions in *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.*, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952) and *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), has been that the new solutions offered contained elements of inequity. See *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979); *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714, 724–26 (2 Cir. 1978). In the *Zapico* opinion I advanced a solution which seemed to me to overcome these objections, 579 F.2d at 726 n.8:

> A solution preferable either to *Dole [v. Dow Chemical Co.*, 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972)], which fails to give adequate weight to the employer's no fault liability and thus may leave him liable for an amount in excess of statutory compensation payments, or to [the decision of the court of appeals in] *Edmonds*, which irrationally reduces an employee's recovery against a third party tortfeasor because of the employer's negligence, would be to allow the longshoreman to recover in full from the negligent third party but to allow the latter to recover from the negligent stevedore the amount of the judgment representing the stevedore's percentage of fault up to but not exceeding the statutory level of compensation payments. When compensation payments have been made, § 33, 33 U.S.C. § 933, would then operate as usual. Under this scheme the employee gets his full damages, the stevedore pays his percentage of the liability but not above the level of the com-

pensation payments which he has bargained for in exchange for his willingness to pay without fault, and the third party is relieved of the obligation to pay the full judgment.[1]

We were not free for procedural reasons to consider this solution in *Zapico*, and in any event we thought that, as an inferior court, we were precluded from doing so. However, if the Supreme Court were convinced of the justice of this solution, I am not sure it could not find a legally defensible way to achieve it. Alternatively, and perhaps preferably, removal of this injustice should be the subject of remedial legislation by Congress. Without this, many of the benefits sought to be accomplished by the 1972 amendments to the LHWCA will be lost.

BONSAL, District Judge (dissenting):

Early in his opinion Judge Meskill states that a jury would have been justified in finding the facts which he sets forth. Then in footnote 3, Judge Meskill states that "... the jury could have found that the facts were as [plaintiff] Evans related them." I agree with the facts as stated by Judge Meskill and from them the jury could have concluded that (1) the shipowner was on notice of the dangerous condition of the flooring in hatch # 2; (2) the shipowner knew, or should have known, that this condition posed an unreasonable risk of injury to the longshoremen; and (3) the shipowner took no steps to correct the condition nor did it require the stevedore to do so, the shipowner insisting only that the ship was to go to sea at the end of the day on which the accident occurred.

The court charged the jury in part that "to recover for negligence the plaintiff must prove that the defendant actually was given notice of or reasonably should have noticed the claimed dangerous condition and should have reasonably foreseen the possibility that someone there might thereby be injured." (A 232–33).

---

1. The reference to *Edmonds* was to the panel decision in 558 F.2d 186 (1977), later modified in banc, 577 F.2d 1153 (4 Cir. 1978) and then reversed, *supra*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521.

On the facts and the foregoing charge, the jury could have found, and did find, that the shipowner was negligent, and assessed damages. It is true that the district judge included in his charge matters not called for by the facts and committed error in giving the pre-1972 charge that the shipowner had a continuing nondelegable duty to furnish longshoremen with a safe place to work and in failing to charge that the stevedore had a primary responsibility for the safety of the longshoremen during loading and unloading operations. However, I don't believe this made any difference since the jury reached the proper result on the facts of the case.

Since the jury were the sole judges of the credibility of the witnesses and believed the plaintiff and his witnesses, it is difficult to see how the jury could have reached a different verdict as to liability, and of course, as the majority points out, the matter of damages was for them to decide and there is nothing this court can do about the somewhat anomalous result which they reached.

The evolution of the law as to the shipowner's liability following the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act has been murky in this circuit, as in others. Judge Meskill's opinion will be extremely useful in dispelling some of the confusion which has existed. However, I do not think that this calls for a reversal. It seems to me unnecessary to send this case back for a new trial with the attendant burden on the court and the expense and delay to the parties. As recently stated by former Chief Judge Lumbard in discussing the role of appellate judges: "As a matter of common sense and judicial administration, you just can't do things over again unless the error, if you find there was error, was sufficiently important so that it really affected the result." *A Conversation with J. Edward Lumbard*, Charles Evans Hughes Press, 1980, at page 80. I do not believe that the errors in the court's charge affected the result. For that reason, I would affirm.